## Wytheville.

## CARY V. NORTHWESTERN MUTAL LIFE INSURANCE COMPANY.

### June 10, 1920.

1. CONTRACTS—*Interpretation and Construction—Surrounding Circumstances.*—In construing every contract we should consider the relation of the parties, the objects to be accomplished and the general circumstances attending its execution. As far as is possible we should place ourselves in the position of the parties to the contract at the time it was executed.

2. INSURANCE AGENTS—*Premiums—Exclusive Territory—Conversion of Policy.*—A contract of a general agent of an insurance company provided that he should not solicit insurance outside of the territory covered by his contract.

   *Held:* That this provision applied to the change of a convertible term policy issued at the office of a second general agent to a resident in such second general agent's territory, especially as there were other provisions in the general agent's contract tending to prevent the invasion by him of the exclusive territory of other general agents.

3. INSURANCE AGENTS—*"Solicit."*—The word "solicit" in the contract of a general agent prohibiting him from soliciting insurance outside of his territory is not to be given a narrow and restricted meaning. The provision was inserted for the benefit and protection of general agents in the territory in which they have exclusive rights, and is intended to assure to each of them commissions on all business of the company within such territory, whether solicited or voluntarily tendered.

4. INSURANCE AGENTS—*Premiums—Exclusive Territory—Conversion of Policy.*—In an action by the general agent of an insurance company for commissions upon the change of a convertible term policy into a 20-payment life policy, upon the life of a person residing outside of the agent's territory, the fact that the policy was not an original policy, but that the assured was entitled to it by virtue of the original renewable term policy has no bearing upon the right of the agent to commissions upon insurance written outside of his territory.

5. INSURANCE—*"Solicit"—Exclusive Territory.*—Such words in the contract of a general agent of an insurance company for a

Statement.

particular territory as "solicit insurance," "soliciting applications" and "solicitation," relate to and cover the general work of the agent, and should not be limited to such business as results from the active, affirmative solicitation or importuning of prospective policyholders by the agent. They are to be construed in connection with and in subordination to the main purpose of the contract to promote such purpose, and not to hinder it. That purpose, so clearly manifested, is to secure to the agent exclusive rights in the specified territory assigned, and commissions on all the business of the company originating in that territory, however secured (with certain exceptions), and whether tendered or solicited.

6. ESTOPPEL—*Waiver—Prejudice.*—A waiver, in order to operate as an estoppel, must arise from conduct evidencing both knowledge and an intention to waive the right in question, and the party against whom an estoppel is sought must by his conduct have caused the party who invokes the estoppel to have acted to his prejudice.

7. INSURANCE AGENTS—*Right to Commissions—Waiver of Provision in Contract by Insurance Company.*—A general agent of an insurance company in Virginia requested his company to convert a term policy, issued through the New York agent of the company, into a twenty-payment life policy, and received a reply that the conversion had been effected. If the transaction had been closed without more, then the company would doubtless have been estopped from denying the agent's claim for commissions upon the transaction. The transaction, however, was not closed, nor intended to be closed, until the initial premium had been paid, and before this was done the company notified the general agent in Virginia that he was not entitled to the commissions unless he had the consent of the New York agent.

   *Held:* That the agent's claim of waiver and estoppel against the company was entirely without merit.

8. INSURANCE AGENTS—*Action for Commissions—Burden of Proof.*—In an action by an insurance agent against a company for commissions, the burden is upon the agent to show that he is entitled to the commissions.

Error to a judgment of the Law and Equity Court of city of Richmond, in a proceeding by motion for a judgment for money. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Lucius F. Cary* and *W. R. Meredith,* for the plaintiff in error.

*Munford, Hunton, Williams & Anderson* and *Thomas B. Gay,* for the defendant in error.

PRENTIS, J., delivered the opinion of the court.

T. A. Cary seeks to recover of the Northwestern Mutual Life Insurance Company, $1,448.04, which he claims to be due as commissions upon a life insurance policy issued to Barron C. Collier.

The controlling facts leading up to the controversy (omitting such details as we think immaterial) are these: On December 2, 1909, the company issued through the office of its general agent, John I. D. Bristol, in New York City, a convertible term policy for $50,000 upon the life of Collier, who was a resident of that city. The assured had the right thereunder, within seven years from its date, upon his written request made while the insurance was in force, and without further medical examination, to have this policy converted into any form of life or endowment insurance issued by the company. Just before the expiration of the seven years period, C. M. Collier, a brother of the insured, wrote to Montague, an agent of the plaintiff (the plaintiff being the company's general agent for Virginia and other specified territory, with offices at Richmond), inquiring whether it would be perfectly proper for him to handle the transaction so as to get the commission out of it, and saying: "Possibly under the rules of your agency you could not very well enter into the competition for the change of this policy, and if you can't let me know at once so that I can take it up with Bristol because the time is not any too

long now. * * * If you cannot handle the matter, however, don't bother with it at all—just let me know." This Mr. Collier, brother of the insured, was the father-in-law of Mr. Montague, the sub-agent, and the motive stated was to secure the commission for him. After reading his contract and instructions, Montague conferred with the plaintiff, who informed him that he could see no reason why the conversion should not be made, but to send him the policy, and that he, the plaintiff, would (to use his own language) "put it up to the company," of course clearly meaning to refer the question involved to the company for decision. Montague wrote to Collier that he could handle the matter and thus make the commission; that while under the agency rules he could not go to New York to solicit such a policy, under the circumstances there would be no trouble about it.

The desired change was indicated by the written request of the assured, but in order to pay the initial premium required, he was to borrow from the company and to execute a policy loan note for $9,363. This was done and the assured also executed his personal note to Montague for $1,493, the aggregate of these two notes being the cost of converting the term policy into a twenty-payment life policy. On December 2, 1916, the term policy was surrendered at the plaintiff's office, with the written request for conversion, the plaintiff on that day forwarded it, asking that the change be made, and that the home office at Milwaukee telegraph when it was made. On December 4th the company wired the plaintiff that the change had been effected, and the plaintiff also advised Montague, all of which was confirmed by letter. On December 9th the company sent the plaintiff a statement showing the cost of conversion, $10,856, which after deducting commissions left the net amount due the company $9,407.95. This was received December 11th. The initial premium, however, had not been paid, for in order to pay it, it was necessary to

have the proceeds of the policy loan note, $9,363. Thereafter and before the company remitted for the amount thus loaned the assured on his policy loan note, the assistant secretary of the company wrote plaintiff thus: "My attention has been called to the conversion of policy No. 811875, Collier, and according to our records he is a resident of New York City, the original term policy having been issued through the general agency of Mr. Jno. I. D. Bristol. According to the surrender for the purpose of conversion it appears that it was executed in New York City, Nov. 29, 1916. Presumably you have authority from Mr. Bristol for effecting this conversion, and if such is the case will you please forward it to this office on receipt of this letter in order that we may allow you the commissions involved. In the event that you have no such authority, we of course would not be permitted to allow you commissions in the case until proper authority had been secured from the New York City general agency and forwarded to this office." This letter was received December 14th, and shown to Montague. On December 15th the plaintiff acknowledged the letter, stating that he thought Mr. Montague was entitled to make the conversion under the circumstances stated, and that he had been confirmed in this view when the conversion had been made with ample time to investigate the circumstances, and concludes, "However, I do not recall a case of this kind and will await your advice with interest." The incomplete transaction proceeded and the check of the company for $9,363, representing the proceeds of the policy loan note which was to be used by Montague in making settlement with the plaintiff for the cost of converting the insurance was remitted, was received by the plaintiff December 18th, and the check therefor delivered to Montague. Thereafter Montague paid the premium, less the share of the commissions which he claimed. Notwithstanding the notice to the plaintiff of December 12th that he would not

be allowed commissions until proper authority had been secured from the New York City general agency, the plaintiff and Montague claimed and deducted the commission, the New York agent refused to consent thereto, and the company refused to allow credit therefor to the plaintiff for himself and his sub-agent, Montague. After repeated demands the plaintiff remitted the amount of the commission to the company with a letter in effect claiming that the sum was not due to the company, and there is controversy as to whether or not this remittance constituted a voluntary payment which is conclusive against the plaintiff's claim.

The company demurred to the plaintiff's evidence, and judgment in its favor was entered by the trial court upon this demurrer of which the plaintiff is here complaining. .

1. The determination of the chief question raised depends upon the construction of the agency contract existing between the plaintiff and the company, the plaintiff claiming that this contract does not prohibit his receiving commissions upon such a policy under such circumstances, while the company insists that the contract itself, fairly construed, does prohibit such an allowance, except by consent of its New York general agent, Bristol, who had a similar contract with the company covering business originating there.

The plaintiff's agency contract appoints him general agent of the company, "to have exclusive charge of the work of soliciting applications and collecting premiums for insurance in said company, under the direction of the said company, and subject to the requirements and provisions of this contract," within the State of Virginia and certain specified territory in North Carolina and West Virginia. After having thus definitely limited the territory in which the plaintiff should operate, there is this provision in the same clause: "But the said general agent shall have no authority on behalf of said company to make, alter or dis-

charge any contract, or to waive forfeitures, and his power shall extend no further than as expressly stated in this contract." Then, among various provisions defining his rights, restrictions and obligations, there is this clause, under the title "Extra-Territorial Business:" "General agent shall not solicit insurance either personally or by correspondence outside of the territory covered by this contract unless he first shall have secured the written consent of the general agent of the company in charge of such field; nor (if such solicitation is to be in a State or Territory other than that in which general agent is already licensed) until general agent first shall have secured through company an agent's license in such other State or Territory." And this under the title, "Commissions on Changed Policies:" "Commissions, both first year's and renewal on policies which in the judgment of company take or are to take the place of renewable term or other insurance in company on same life, shall (irrespective of any other terms or provisions of this contract) be governed by the practice of company relative thereto."

[1-4] In construing every contract, we should consider the relation of the parties, the objects to be accomplished, and the general circumstances attending its execution. As far as possibly, we should place ourselves in the position of the parties to the contract at the times it was executed. The provisions quoted, which are doubtless common to such contracts between life insurance companies and their general agents, were obviously intended by the parties to secure to every general agent the exclusive right to the scheduled commissions upon all business of the company within the territory assigned to him. They were as clearly intended to prevent the agent in New York from invading the exclusive territory assigned to the agent in Virginia as they were to prevent the Virginia agent from securing the benefit of business within the exclusive territory of the

New York agent. It is claimed by the plaintiff that this
provision as to extra-territorial business, prohibiting the
general agent from soliciting insurance outside of his own
territory, should be construed strictly against the company,
and that it does not apply to a case like this where the
business was not solicited by the agent; and we are re-
ferred to certain cases in which the word "solicit," or its
equivalent, has been construed. They are, however, cases
in which the court was construing statutes or ordinances
imposing penalties for crimes, or upon soliciting or sales
agents for soliciting or selling without having paid the
proper revenue license therefor; e. g., Sandefur Julian Co.
v. State, 72 Ark. 12, 77 S. W. 596; Scribner v. Mohr, etc.,
90 Neb. 21, 132 N. W. 734, Ann. Cas. 1912-D, 1287.

In construing an Iowa statute (Acts 18th Gen. Assem.
c. 211, §1), providing that "Any person, who shall here-
after solicit insurance or procure applications therefor,
shall be held to be the soliciting agent of the insurance
company or association issuing a policy on such applica-
tion," etc., the court said: "Now, while Giberson did not
solicit the insurance in the sense of having importuned
defendants to apply for it, he did procure the application
within the meaning of the statute; for he received it, and
at his request the policy was issued upon it. To hold other-
wise would be to put an exceedingly narrow construction
upon the words of the enactment, and one which in many
cases would defeat the manifest legislative intent. The
manner in which such business is transacted is known to
all men. Prudent business men and property owners do
not wait to be personally solicited before procuring in-
surance on their property, but their custom is to apply
to the agent of some company or association engaged in
the business of insurance; and, if the agent is a mere
solicitor, their application is forwarded to some agent or
officer having authority to accept or reject it. The statute

was as certainly intended to apply to transactions of that kind as to those in which the agent procured the application by personal solicitations; and that was the character of the transaction in question." *St. Paul, etc., Ins. Co.* v. *Shaver,* 76 Ia. 286, 41 N. W. 19, 20.

In this contract these clauses must be considered in connection with the objects and purposes of the parties thereto, and with the other clauses therein indicating those purposes. It is clear therefrom that the territory assigned to the plaintiff is limited, and by way of emphasis upon this limitation, it is expressly provided in the first clause of the contract that the agent's powers shall extend no further than as expressly stated therein. The record shows that all policies tendered to the plaintiff, although not solicited by him or any of his sub-agents, but which originated within the territory assigned to him, were regarded by him as included within his contract, and constitute business upon which he was entitled to commissions thereunder. The word "solicit" in this contract was not intended to have a narrow and restricted meaning. The provision was inserted for the benefit and protection of general agents in the territory in which they have exclusive rights, and is intended to assure to each of them commissions on all business of the company within such territory, whether solicited or voluntarily tendered. There are three admitted exceptions to the extra-territorial clause—one where an agent had written a term policy, and thereafter the assured had moved into the territory of another agent, when the original agent could still convert the policy if sent to him for conversion; another, where the assured, at the time the original policy was issued, lived in a foreign territory, but who had removed into the territory of another agent and was residing in that territory at the time the conversion was requested; and again, even though the person desiring the policy resided outside of the ter-

ritory, if the solicitation, application and examination were all completed within the territory of the agent sending in the application, the company would issue the policy, notwithstanding such foreign residence of the assured.

Counsel for the plaintiff emphasize the fact that this policy was not an original policy, but that the assured was entitled to it by virtue of the original renewable term policy. We are unable to agree that this makes the slightest difference. While it is true that the assured had the right under his original contract to have the twenty-payment life policy issued to him, and the company was obliged, under its contract, to do so upon his written application therefor, it was none the less a new policy of insurance, costing the assured a very much larger premium, securing correspondingly larger benefits, and imposing upon the company new, different and greater obligations. As it constituted a new and different policy which the company was required to issue upon the written request of the assured, no reason is perceived for applying any different rule to it, under the plaintiff's contract, than if it had been an original application requiring a medical examination.

[5] Such words in the contract as "solicit insurance," "soliciting applications," and "solicitation," relate to and .cover the general work of the agent, and should not be limited to such business as results from the active, affirmative solicitation or importuning of prospective policyholders by the agent. They are to be construed in connection with and in subordination to the main purpose of the contract to promote such purpose, and not to hinder it. That purpose, so clearly manifested, is to secure to the agent exclusive rights in the specified territory assigned, and commissions on all the business of the company originating in that territory, however secured (with the certain well determined and specified exceptions hereinbefore noted), and whether tendered or solicited.

We have been referred to no case involving the construction of precisely such a contract, but we are clear in our view that the fair doubt as to the right of the plaintiff to transact this business which was expressed by the brother and agent of the assured who first approached Montague, and afterwards by Montague as well as by the plaintiff himself, should have been resolved against their right to these commissions, and that the company properly determined that they belonged to Bristol, the New York agent, under his contract, instead of to the plaintiff.

2. It is claimed that with full knowledge of what had been done by the plaintiff and his sub-agent, the company waived its right to rely upon the contract, and is therefore estopped from invoking that contract as a defense.

[6] In *Smith* v. *Powell,* 98 Va. 436, 36 S. E. 522, 524, this is said: "It is of the essence of estoppel that the act relied upon as such should have been injurious and to the prejudice of him who relies upon it as an estoppel." A waiver, in order to operate as an estoppel, must arise from conduct evidencing both knowledge and an intention to waive the right in question, and the party against whom an estoppel is sought must by his conduct have caused the party who invokes the estoppel to have acted to his prejudice.

In *Luck Construction Co.* v. *Russell,* 115 Va. 342, 79 S. E. 393, 395, this is said: "The doctrine of estoppel *in pais* is purely an equitable one, and it is essential to the application of that principle that a party claiming to have been influenced by the conduct of another to his injury was ignorant of the state of facts relied on to constitute such estoppel. *C. & O. Ry. Co.* v. *Walker,* 100 Va. 69-70, 92-93, 40 S. E. 633, 914, and authorities cited. And still less can he base a claim for an estoppel upon the acts or conduct which were induced by his own acts."

[7, 8] Now the facts upon which the plaintiff relies to

show an estoppel are, that on December 4, after having received the term policy with request for conversion, the defendant wired (in compliance with his request) that the conversion had been effected, and that this telegram was confirmed by letter, and that on December 9 a statement was sent showing the commissions which would be due on the issuance of the new policy. If the transaction had been closed without more, then the company would doubtless have been estopped from thereafter denying the plaintiff's claim. The transaction, however, was not closed, nor intended to be closed until the initial premium had been paid, and this was not done until December 18, while in the interval, on December 12, the company notified the plaintiff, in clear and unequivocal language, that according to its construction of the agency contract the plaintiff was not entitled to the commissions unless he had the consent of Bristol, the New York agent, waiving his rights and authorizing the transaction. The letter closes with this language: "We of course would not be permitted to allow you commissions in the case until proper authority had been secured from the New York City general agency and forwarded to this office." With this express notice before him, and six days after he had received it, the plaintiff ignored the company's warning, and while he had full time to suspend the transaction until there could have been a full and definite understanding with the company as well as with Bristol as to their respective rights, he closed it and deducted the commissions which he claimed for himself and his sub-agent Montague. His claim of waiver and estoppel is therefore entirely without merit. The burden was and is upon him to show that he was entitled to these commissions, and he has failed to do so. Whatever equities there may be in his favor, he is bound by his agency contract, and took the risk of losing the commissions, which he had been notified the company would not

allow without Bristol's consent, before he closed the transaction.

We have heretofore alluded to the claim of the company that the payment of the amount involved by the plaintiff was voluntary, and hence cannot be recovered. In view of the letter which accompanied this remittance, this presents a doubtful question, the decision of which is not necesssary for the determination of this case, and we express no opinion with reference thereto.

There are several other errors assigned as to the rejection of evidence tendered by the plaintiff, but inasmuch as, even if it had all been received, the defendant's demurrer would still have been good, it is unnecessary to discuss these alleged errors.

*Affirmed.*