THE PINKERTON TOBACCO COMPANY

v.

WILLIAM H. MELTON

Record No. 921965

November 5, 1993

Present: All the Justices

*Samuel M. Brock, III (D. Eugene Webb, Jr.; Mays & Valentine,* on briefs), for appellant.

*N. Leslie Saunders, Jr. (Miles Carey, Jr.; Minor, Saunders, Cary & Patterson,* on brief), for appellee.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

In this breach of contract case, The Pinkerton Tobacco Company appeals from a judgment based upon a jury verdict awarding a former employee, William H. Melton, damages for the company's failure to pay him compensation under its "Long-Term Incentive Plan" (the Plan). According to its language, the Plan's objectives are as follows:

(a) To attract and retain key management personnel in order to ensure the short- and long-term success of the Company.

(b) To provide incentive for such personnel that will tie their interests and motivations with those of the owners of the Company.

(c) To provide opportunities for personal financial gain to individuals who make significant contributions to the success of the Company.

The Plan was designed to provide participants with enhanced compensation if the company attained certain threshold levels of financial performance during a three-year cycle. Shortly after the commencement of a cycle, participants were issued "performance units," ascertained on the basis of their relative positions in the company. It was contemplated, however, that payment would not be made until completion of the full performance cycle.

Pertinent here is a cycle beginning January 1, 1987, and ending December 31, 1989. Approximately 100,000 performance units were allocated for this cycle, with 4,825 assigned to Melton who, at

the time, was Pinkerton's vice-president of marketing. He was discharged from employment with Pinkerton on January 3, 1989, and, hence, did not complete the performance cycle.

In the event of a participant's termination of employment mid-cycle, the Plan provided as follows:

If a participant leaves the Company before the end of a performance cycle for reasons other than death, disability, or retirement, the units awarded to the incumbent would be forfeited and reclaimed for distribution to other participants. In the event of death, total and permanent disability, or retirement, a participant, or a participant's estate, would be eligible to receive an incentive award pro-rated for the months during which the individual participated in the performance cycle.

Melton claimed that when he was discharged, his supervisor assured him he would receive an award under the Plan. However, Pinkerton rejected Melton's demand for payment, and he responded by filing a motion for judgment seeking recovery of damages from Pinkerton in the sum of $119,563.50.

Pinkerton filed grounds of defense denying any liability to Melton and also filed a pretrial motion for summary judgment. The trial court denied the motion, holding that the provisions of the Plan were ambiguous and that a jury should resolve the ambiguity. In a jury trial, Melton received a verdict for $70,895.33, upon which the trial court entered judgment. We awarded Pinkerton this appeal.

The focus of the parties' debate concerning ambiguity is upon the word ''leaves,'' as used in the phrase, ''[i]f a participant leaves the Company.'' Pinkerton argues there is no ambiguity in the phrase.*
While Melton pays lip service to the trial court's finding that the language of the phrase is ambiguous and says we should uphold the finding, the real force of his argument is directed to convincing us that the language is not ambiguous. Indeed, he even says on brief he ''believes that the trial court should have granted *his* motion for

---

* Melton contends Pinkerton is foreclosed from arguing before this Court that the Plan is not ambiguous. Melton says that while Pinkerton "made numerous motions for summary judgment and a motion to strike the evidence of Melton," Pinkerton "failed to object to any of the instructions granted by the Court or assign error to the granting of said instructions." However, Melton is foreclosed from making this contention by this Court's decision in *Wright v. Norfolk & W. Ry.*, 245 Va. 160, 170, 427 S.E.2d 724, 729 (1993), and the 1992 amendment to Code § 8.01-384(A).

summary judgment on the grounds the Plan was not ambiguous.''
(Emphasis added.)

The gist of Melton's argument is contained in this quotation from his brief: ''The use of the words 'leaves the company', without any reference to involuntary termination or dismissal from employment, leads to the conclusion that the aforesaid phrase means *solely* the voluntary act on the part of the employee participant leaving employment, taking into consideration the purpose of the Plan.'' (Emphasis added.) Melton concludes that, because ''being dismissed or terminated by the employer is an involuntary act,'' he is entitled to benefits under the Plan.

To the extent Melton's argument may be construed to include an assertion of ambiguity, we might agree with the argument if ''leaves the Company'' were the only language we had to consider. But it is not the only language, and the language with which it must be considered is important; indeed, it is determinative.

■ The language we must consider reads: ''If a participant leaves the Company before the end of a performance cycle for reasons other than death, disability, or retirement, the units awarded to the incumbent would be forfeited and reclaimed for distribution to other participants.'' We think this language, when read as a whole, is clear and unambiguous and means that if a participant's employment with the company terminates before the end of a performance cycle for reasons other than death, disability, or retirement, he forfeits his performance units, whether the termination is voluntary or involuntary.

■ While death (except for suicide) and disability (except for self-inflicted injury) are not voluntary acts, retirement often is a thoroughly voluntary act. Hence, the language in dispute encompasses within its scope concepts of both voluntariness and involuntariness, evincing the intention of the parties to include both voluntary and involuntary acts as bases for giving preclusionary effect to the provision for forfeiture of performance units.

Furthermore, as Pinkerton states on brief, ''[t]he Plan does not distinguish between voluntary terminations and involuntary terminations because it encompasses all situations wherein employees leave employment.'' Had Melton continued in Pinkerton's employment until the end of the then current performance cycle, he would have been eligible for a full incentive benefit award. Had he left Pinkerton before the end of the performance cycle for reasons of death, disability, or retirement, he, or his estate, would have been

eligible for a pro-rated award. If, as was the case, he left before he completed the then current performance cycle for a reason other than death, disability, or retirement, he would have forfeited his performance units. These are the only scenarios that can be developed from the Plan's language, and none provides Melton with a basis for relief.

Melton argues, however, that to include involuntary acts within the scope of the Plan's preclusive language would, contrary to the Plan's objectives, permit Pinkerton, in an act of bad faith, to wait until the very end of a performance cycle before terminating an employee, resulting in a forfeiture of the Plan's benefits and a distribution of the employee's performance units to those responsible for his discharge. But that is not the situation here, and we will await a case presenting those facts before expressing any opinion on the outcome of that sort of dispute.

█ Further, Melton cites the rule that the interpretation the parties place upon the terms of a contract is entitled to great weight. He then points to his testimony that his supervisor told him he would be paid benefits under the Plan. He also points to the testimony of other witnesses, including the Pinkerton employee responsible for administering the Plan, that some participants whose employment was terminated involuntarily, and others whose employment was terminated voluntarily, were paid benefits under the Plan.

The "party interpretation" rule is applicable, however, only " '[w]hen the terms of an agreement are doubtful or uncertain.' " *Dart Drug v. Nicholakos*, 221 Va. 989, 995, 277 S.E.2d 155, 158 (1981) (quoting *O'Quinn v. Looney*, 194 Va. 548, 552, 74 S.E.2d 157, 159 (1953)). Here, as we have demonstrated, the terms of the Plan are not doubtful or uncertain, and so the rule is inapplicable.

Melton cites several decisions from other jurisdictions which, he says, "construe the . . . phrase 'leave employment' or 'leaving employment' [to] mean a voluntary termination or voluntary quitting of employment, not the dismissal or firing of one from employment." While the cases cited by Melton generally differ from the matter at hand in their factual and legal makeup and in the contractual provisions being reviewed, one, as Melton describes it, "presents a factual situation very similar to the instant case."

In *Enstar Corp. v. Bass*, 737 S.W.2d 890 (Tex. App. 1987), an employee incentive program, which was conceded to be "unambiguous," *id.* at 893, provided that a participant "must be employed by the Company on December 31 of a Program year in order to earn

the incentive units [the employee was] awarded for that Program year," *id.* at 891. It was further provided that if a participant "terminated [his] employment with the Company for any reason other than death, retirement or permanent disability, [he] would receive no further payments for incentive units . . . and would forfeit all unpaid incentive units." *Id.* at 891-92.

Several employees were terminated prior to December 31 of the program year because their services were no longer needed. Notwithstanding that they were "not employed on the critical date required by the compensation plan," *id.* at 892, they were allowed recovery for "all past years' bonuses which had been earned and remained unpaid, and . . . a pro rata bonus for the part of the year worked prior to termination of . . . employment," *id.* at 893.

It appears the rationale for the court's decision was that, because the employees were terminated without good cause, they would be entitled to recover. The expression, "without good cause," or some variation of it, is used or is quoted a number of times in the course of the court's opinion. Yet, as the court concedes, "[n]o mention is made *in the plan* of the company's termination of an employee's employment, whether for good cause or without good cause." *Id.* at 893 (emphasis added). It is obvious, therefore, that the *Enstar* court wrote the "good cause" provision into the parties' contract, an exercise we decline to engage in here.

Accordingly, we will reverse the judgment of the trial court, set aside the jury's verdict, and enter final judgment in favor of Pinkerton.

*Reversed and final judgment.*

JUSTICE LACY, dissenting.

Where the language of an agreement is clear and capable of only one reasonable construction, a court must read the agreement according to its plain meaning, *Paramount Termite Control Co. v. Rector*, 238 Va. 171, 174, 380 S.E.2d 922, 925 (1989), and may not search for its meaning beyond the instrument itself. *Management Enters., Inc. v. Thorncroft Co.*, 243 Va. 469, 472, 416 S.E.2d 229, 231 (1992). Because I do not agree that the majority's construction of the relevant provision in the "Long-Term Incentive Plan" (Plan) is the only one reasonable, I respectfully dissent.

The relevant provision of the Plan reads:

> If a participant leaves the Company before the end of a performance cycle for reasons other than death, disability, or retirement, the units awarded to the incumbent would be forfeited and reclaimed for distribution to other participants.

Contrary to the arguments now offered by both Melton and Pinkerton Tobacco, the trial court was correct in concluding that there is ambiguity in this provision.

Pinkerton contends that the phrase "leaves the Company" unambiguously covers both voluntary quitting and involuntary termination of employment. I do not agree. The ambiguity inherent in this phrase becomes more apparent when it is compared to analogous language in *Enstar Corp. v. Bass*, 737 S.W.2d 890 (Tex. App. 1987), which case, the majority concedes, is factually similar to the instant case. In *Enstar*, the employee incentive program provided, in relevant part, that "[i]f *you terminated your employment* with the Company for any reason . . ." you, as a participant, "would forfeit all unpaid incentive units." *Id.* at 891-92 (emphasis added). The emphasized language refers unambiguously to a situation in which the participant himself, not the employer, terminates employment. This sharply contrasts with the instant case, where the phrase "leaves the Company" could imply either a voluntary or an involuntary cause for the employee's leaving.

This ambiguity is not mitigated by placing this phrase in context with the rest of the provision. The enumerated exceptions of "death, disability, or retirement," for which compensation is granted, do not clarify whether the parties intended to include voluntary acts, involuntary acts, or both. The majority interprets this language to encompass "within its scope concepts of both voluntariness and involuntariness," and as evidence that the parties intended to include both voluntary and involuntary acts as bases for precluding forfeiture. However, another construction of the provision is equally reasonable. Death, disability, and retirement may all arise involuntarily. A strong argument can therefore be made that the exceptions indicate that the Plan was designed to reward all those participants who "leave[] the Company" involuntarily.

Where it is necessary for a court to consider the meaning of an ambiguous provision, consideration will be given to the relation between the parties, the purpose sought to be accomplished, and the general circumstances attending execution of the instrument. *Cary v. Northwestern Mut. Life Ins. Co.*, 127 Va. 236, 242, 103 S.E. 580,

582 (1920). The principal rule of construction of ambiguous agreements is that the intent of the parties is the primary consideration. *Poindexter v. Molton*, 237 Va. 448, 450, 377 S.E.2d 450, 452 (1989).

Perhaps the best indication of the parties' intent here is that expressly stated in the Plan itself. The express objectives of the Plan can be summarized as follows: First, the Plan aspires to attract and retain motivated personnel. Second, the Plan serves to motivate participants to contribute to making the company successful. Third, the Plan rewards with money those who contribute significantly, in proportion to their contributions. These objectives cannot be attained by simply disbursing an unpredictable bonus as a ''thank-you'' at the end of a particularly financially successful year. Nor can they be attained by distributing a good-will Christmas bonus that employees expect to receive independent of their performance. Rather, the Pinkerton Plan is an affirmative incentive plan designed to attract, motivate, and reward those who make significant contributions to the success of the company.

In order to construe a contract, a court must place itself in the position of the parties at the time the contract was executed. *Cary*, 127 Va. at 242, 103 S.E. at 582. Given the intent of the Plan, it is inconceivable that either party would bargain, *ex ante*, for the agreement as construed by the majority. Neither of the parties to this agreement would bargain, *ex ante*, to create a plan in which rewards would be forfeited in cases where the employee ''leaves the company'' involuntarily.* Such a plan would create a strong disincentive to participate in the plan, as the company could fire participants prior to completion of a performance cycle. The result would, contrary to the express objectives of the Plan, neither attract and retain motivated personnel, provide an incentive to contribute to the success of the company, nor reward with money those who contributed significantly, in proportion to their contributions. Such a construction undermines every express objective of the plan and, therefore, cannot represent the intent of the parties.

Melton testified that when he was terminated, Thomas J. Guinan, then Pinkerton's Executive Vice-President, told Melton that he

---

* While the majority states that the Court should reserve judgment regarding whether its construction of the Plan permits bad-faith firing of employees and therefore creates a perverse incentive, such a consideration is relevant to determining the intent of the parties to the agreement.

would receive benefits under the Plan. Jerry F. McQuade, administrator of the Plan, testified that an executive employee who was terminated for other than cause would be eligible to receive a pro rata share under the Plan. Furthermore, other executive employees who left the company prior to completion of a performance cycle "for reasons other than death, disability, or retirement" received their pro rata benefits. Such testimony indicates that Pinkerton's interpretation of the disputed portion of the Plan, as demonstrated by its own conduct, is consistent with the interpretation now urged by Melton.

Finally, there is no evidence of other benefits or plans offered by the company which can be forfeited retroactively when an employee involuntarily "leaves the Company."

Accordingly, I would affirm the judgment of the trial court.