# Richmond

## Henry C. Bolling v. Hawthorne Coal and Coke Company, A Corporation.

November 28, 1955.

Record No. 4405.

Present, All the Justices.

The opinion states the case.

*M. M. Long* and *Joseph Michael Kuczko,* for the appellant.

*Greear, Bowen, Mullins & Winston,* for the appellee.

SPRATLEY, J., delivered the opinion of the court.

This is a proceeding by Hawthorne Coal and Coke Company, a corporation, hereinafter referred to as Hawthorne, for a declaratory judgment against Henry C. Bolling, establishing its right to remove a railroad coal tipple, a domestic coal tipple, a heating plant, and certain plumbing fixtures in a store and office building constructed or placed on the lands of Bolling by Hawthorne. Petitioner prayed the Court "to construe and interpret" an "Agreement" between the parties, dated July 5, 1948, a copy of which was filed with its petition.

Bolling filed an answer and cross-bill, denying the right of Hawthorne to remove the tipples, the heating system or the plumbing fixtures, on the ground that under a "Lease and Option," dated July 5, 1948, and referred to in the "Agreement" of that date, it was understood and agreed by the parties at the time that the entire contract constituted a sale of the lands, coal and coke plant therein described, on an installment basis; that it was agreed

between the parties before and at the time of the execution of the two instruments that in no event should buildings or other permanent fixtures placed upon the premises by Hawthorne be considered as improvements subject to be removed by the latter; that the tipples are permanent structures attached to the freehold and the heating plant and plumbing fixtures in question are permanent fixtures fastened to buildings in such a manner as would cause great damage to the buildings if removed; that Hawthorne has not complied with its contract to return said property in as good condition as when received by it, and in a condition to operate as a going concern; that under the terms of its contract Hawthorne has the right to remove such equipment, improvements and machinery as can be removed without damage to the buildings, but in no event has it the right to remove any of such property until it has fully complied with the terms of its original agreement; and that he, Bolling, was willing to try to reach an agreement with Hawthorne as to the value of any equipment and machinery placed by it upon the property which were not replacements for like property of Bolling that had become broken, damaged, removed or destroyed during Hawthorne's occupancy. A copy of the said "Lease and Option" was annexed to the answer.

In his cross-bill, Bolling alleged damages to his property, both personal and real, and prayed for a judgment in the sum of $30,000 against Hawthorne.

Voluminous evidence was taken by depositions, and the Court delivered a written opinion, in which it held that the pertinent provisions of the "Agreement" were not in conflict with any provision in the "Lease and Option;" that the contentions of Bolling were in contradiction of the written instruments; and that Hawthorne was entitled to recover from Bolling all of the equipment, improvements and machinery placed by it on the premises in question and "in addition, a fair rent for the time they had been used by Bolling, or the fair value of such equipment, improvements and machinery at the time that Bolling took possession, with interest from that time; and that the defendant is entitled to recover from Hawthorne such damages as he may have sustained by its failure to turn back the leased premises to the defendant as a going concern, and in shape to operate, in as good condition as when received from lessors, reasonable wear and tear excepted."

The parties being unable to arrive at an amicable settlement of

their differences, the Court entered a decree in accordance with its opinion, and referred the cause to special commissioners, who were directed to ascertain and report what equipment, machinery and improvements of Hawthorne were withheld by Bolling; the fair cash and fair rental value of each piece or article of said property as of July 1, 1950; the damages which Bolling may have sustained by reason of Hawthorne's failure to turn back the "leased premises" as a going concern, etc.; and any other matter or thing deemed relative or pertinent.

The two instruments to be construed were simultaneously executed on July 5, 1948, to take effect as of July 5, 1948. One is called an "Agreement;" and the other is called "Lease and Option." Both were prepared in Bolling's office, Bolling being an attorney at law, on his paper, and typed by his secretary, as dictated by Walter A. Kelley, counsel for Hawthorne. Present in addition to Kelley and Bolling were H. L. Thompson, President of Hawthorne, Wallace Powers, a law associate of Kelley's, and Jack L. Sullivan, agent of H. L. Thompson, and Vice-President of Hawthorne.

The pertinent provisions of the instrument called "Lease and Option" are:

"That for the sum of $1.00, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Lessors (H. C. Bolling and wife) do hereby demise, lease and let unto the Lessee, (Hawthorne) its successors and assigns, those certain lots, tracts or parcels of land, together with all the buildings, improvements, rights, privileges and appurtenances thereunto pertaining, lying and being in the County of Wise, State of Virginia, and more particularly bounded and described as follows: (Here follows a description of approximately nineteen acres of land.)

### "1. Term

"This lease shall be fully effective and in force for a period of four (4) years, extending from the beginning of the first day of July, 1948, to the end of the 30th day of June, 1952, and the Lessee for itself and successors and assigns, agrees and covenants to pay unto the Lessors in advance on or before the 10th day of the month, a monthly rental to be agreed upon by Lessors and Lessee.

### "2. Option to Purchase

"Lessors hereby give and grant to the Lessee, its successors and

assigns, the exclusive right or option to purchase at any time within thirty (30) days from the 30th day of June, 1952, all property of every kind, whether real or personal, leased to the Lessee, by the terms of this agreement, at a price to be determined by agreement of the Lessors and Lessee.

"In the event of Lessee electing to exercise this option the Lessors shall convey all real estate to Lessee by general warranty deed, and all personal property by a proper bill of sale.

### "3. REMEDIES OF LESSORS

"The Lessors shall have all the usual rights and remedies provided by statute for the collection and enforcement of rents payable hereunder as between landlord and tenant. If the Lessors do not receive any rental when due, the Lessors may at their option, and in either event, give notice in writing to the lessee of such default, and if the Lessee shall fail to pay the same within thirty days after receipt of such notice, then the Lessors may at their option, terminate all rights of the Lessee hereunder and Lessors shall be entitled to possession of the lands, together with all improvements, machinery, equipment and all property of every kind and nature thereon, upon written notice of the Lessee.

### "6. OPERATION OF PROPERTY

"Lessee shall operate the property in a careful workmanlike manner, and keep the same in a good state of repair at its own cost and expense, and in the event of the termination of this Lease and Agreement, Lessee shall turn over the property and all improvements, fixtures and equipment thereon to Lessors, as a going concern, and in shape to operate, in as good condition as when received from Lessors, reasonable wear and tear excepted.

### "9. REMOVAL OF EQUIPMENT

"Lessee shall have the right to remove at any time, all or any part of the machinery, equipment and personal property leased herein, provided it is replaced by machinery, equipment and personal property of equal or greater value.

### "12. SUCCESSORS AND ASSIGNS

    \*        \*        \*        \*        \*        \*        \*

"All previous negotiations between the parties are merged in this

instrument, which contains the complete agreement of the parties, except such conditional terms, conditions and covenants as are contained in that separate writing, designated therein and herein as 'AGREEMENT,' entered into by and between the HAWTHORNE COAL AND COKE COMPANY, INC., and H. C. BOLLING, dba., HAWTHORNE COAL AND COKE COMPANY, bearing the same date as the date hereto, and executed simultaneously with the execution of this agreement."

In the "Agreement" we find the following provisions:

"WITNESSETH THAT, in consideration of $1.00 and the mutual promises contained herein and in the said 'LEASE AND OPTION,' the parties hereto agree as follows:

"3. RENTAL: HAWTHORNE agrees to pay BOLLING the sum of $4,000.00 per month for a period of 48 months, unless this agreement and the 'LEASE AND OPTION' are cancelled as provided in Paragraph 5 below. All rental shall be due and payable in advance on or before the 10th day of the month. This rental has been agreed upon by HAWTHORNE AND BOLLING, and is the rental to be agreed upon by the Lessors and Lessee in Paragraph 2 of Article 1, of the 'LEASE AND OPTION' referred to herein.

"4. OPTION TO PURCHASE: HAWTHORNE shall have the right to purchase all property set forth in the lease and agreement, including any additions thereto at the expiration of 48 months from date, at a price to be determined by HAWTHORNE, in its sole and absolute discretion, provided that all past due rentals are paid in full.

"5. CANCELLATION: HAWTHORNE shall have the right to cancel this agreement and the 'LEASE AND OPTION,' upon giving BOLLING ninety (90) days written notice of its intention to do so, provided, however, that if HAWTHORNE exercises this right of cancellation prior to the expiration of 24 months from date, it shall pay to BOLLING a minimum rental of $96,000.00 representing rent for 24 months. When 24 months rental have been paid, HAWTHORNE shall be under no obligation to continue to operate the property, provided it has given the notice set forth herein, and all past due rentals have been paid in full.

"6. OPERATION: The property is to be operated in a careful and business like manner, and in the event of cancellation or the failure of HAWTHORNE to exercise the option to purchase the property, all property set forth in the 'LEASE AND OPTION' is to be turned over to BOLLING in as good condition as when turned over to HAWTHORNE, reasonable wear and tear excepted. In the event of such

cancellation or failure to exercise the option to purchase, BOLLING shall have the exclusive right for 90 days, to purchase all equipment, improvements and machinery placed on the property by HAWTHORNE, at a price to be determined by three appraisers, one to be appointed by HAWTHORNE, one by BOLLING and the third by the two so appointed. In the event BOLLING DOES NOT elect to purchase such equipment, improvements and machinery, HAWTHORNE shall have the right to remove the same, provided all past due rentals are paid and the properties are left in a condition to operate as a going concern.

"7. ADVANCE OF RENTAL: HAWTHORNE agrees to pay BOLLING six (6) months advance rental, amounting to $24,000, the receipt of which is hereby acknowledged, which sum is to be applied on the rental accruing for the 19th through the 24th months' occupancy. In the event this agreement and the 'LEASE AND OPTION' are cancelled in accordance with the provisions in Paragraph 5, prior to the expiration of 24 months, then this rental advanced shall be applied on the minimum rental provided for therein."

        \*      \*      \*      \*      \*      \*      \*

In Clause 14 it is provided that:

"All previous negotiations between the parties are merged in this instrument, which contains the complete agreement of the parties, except such conditional terms, conditions and covenants as are contained in that separate writing, designated therein and herein as 'LEASE AND OPTION' entered into by and between THE HAWTHORNE COAL & COKE COMPANY, INC., and H. C. BOLLING: bearing the same date as date hereto, and executed simultaneously with the execution of this agreement."

In another clause the Fork Junction Coal Company guarantees the payment of "24 months rental by Hawthorne."

A large number of witnesses testified and numerous exhibits were filed. The evidence may be summarized as follows:

Prior to the execution of the two instruments, Bolling was the owner of approximately nineteen acres of land, on which certain coke ovens were located, and he was operating and doing business under the name of Hawthorne Coal and Coke Company. In May, 1948, Jack L. Sullivan, a representative of H. L. Thompson, the President of the Red Ash Pocahontas Coal Company and owner of the Fork Junction Coal Company, told Bolling that Thompson was

interested in the Hawthorne property. After some negotiations between Sullivan and Bolling, Thompson came to see Bolling at the plant and continued negotiations. Subsequently, he conferred with Bolling by writing and telephone calls. Bolling said that on July 1st, 1948, he reached an agreement over the telephone, whereunder Thompson agreed to buy the plant for $192,000 by paying $24,000 as a down payment and the balance in four years. Thompson wanted to pay the balance in three years, while Bolling desired the payments to extend over a five-year period. A compromise was reached fixing the period at four years.

The date of July 5th was set for the closing of the transaction, and it was agreed that the sale would be made as of July 1, 1948. Inventories of the stock and merchandise belonging to the operation were taken on the night of July 1st by Sullivan, and on the same day Bolling wrote Thompson confirming the sale of the property on a "lease purchase basis at the figure mentioned in our agreement letters of June 19 and 21. * * *." He added that Sullivan understood the situation and had been delivered a copy of the letter.

On July 5th, Thompson, Kelley and Powers, attorneys for Thompson, and Sullivan came to the office of Bolling at Norton, Virginia, to close the transaction as agreed upon between Bolling and Thompson. Kelley brought with him forms of instruments which he said had been used by Thompson in similar transactions. Kelley dictated two instruments to Bolling's secretary. Bolling expressed surprise when the drafted instruments were presented to him, because he said the conditions, price and payments had already been agreed upon and only the details were lacking. Kelley explained that the purpose of two instruments was to try to avoid federal income taxes on a capital investment, and that he thought he could get the Tax Department to construe the monthly installments as rental. Thompson made two or three changes, while Bolling suggested one change. Thompson was in a hurry to leave, and left before the papers were completed and executed, advising Bolling that Sullivan would act for the corporation. According to Bolling, he and Thompson had discussed the tipples the former had under construction, and it was agreed by Thompson that any buildings and tipples constructed or completed by Hawthorne would remain a part of the real estate in the event the purchase price was not fully paid and the plant was returned to Bolling; but that machinery would be classified as personal property, and they could

arbitrate the price which he had to pay if he desired to purchase it. He said that Thompson, during their discussion, remarked that he had been raised in Giles County, Virginia, and understood the law to be that no buildings his Company might put on the premises could be removed, and there was "no need to worry one minute about the completion of the payments on the contract, because we have bought the property." H. L. Thompson did not appear as a witness and contradict this testimony, nor was his absence explained.

Hawthorne took possession of the property as of July 1, 1948. In June, 1949, Hawthorne purchased the property of the Norton Coal Company, one mile distant from the Bolling plant, and transferred to the Norton plant considerable of the former operations of the Hawthorne plant. Representatives of Hawthorne subsequently got in touch with Bolling on several occasions requesting him to agree to rewrite the instruments in order that it might obtain consent of the Bureau of Internal Revenue to pay income taxes on the basis of rentals instead of a purchase. Bolling, in the meantime, made his income tax returns on the basis of a sale of the property. Bolling said he refused to make any change and he was then advised by Hawthorne that it would not take the plant as a gift, because it was in a run down condition and in bad shape, and that its taxes would be in excess of the amount of the worth of the plant. Upon Bolling's continued refusal, Hawthorne, on August 11, 1949, notified Bolling of its intention to cancel the agreement and lease and option at the end of the 24-month period thereof, that is, on June 30, 1950. Nothing was said in the notice about the removal of the tipples, nor was there any expression of an intention to remove them, or attempt to do so until June 30, 1950, the last day of Hawthorne's possession. Bolling thereupon refused Hawthorne the right to remove any permanent improvements on the property.

The keys to the plant were delivered to Bolling on July 1, 1950. Bolling began an examination and inspection of his plant, and found that it had been damaged considerably and was not in a condition to operate. Ovens were not burning, some had to be repaired; the roof of one of the tipples was leaking; the machinery was in need of repair; tools and other personal property were missing; the buildings had been broken into; and a water tank had not been filled and its timbers had dried to such an extent it would not hold water, and Bolling was not able to get the plant in full operation until subsequent to August 8, 1950. He further found that Hawthorne had

not then paid real estate taxes amounting to $388 during the two years it had the plant.

The records disclosed that Hawthorne had not listed the tipples or any permanent structure or property of any kind on Bolling's property for taxation in its name, and that the United States Bureau of Internal Revenue had filed a tax assessment as a lien against Hawthorne in the sum of $3,934.08. Hawthorne charged off the cost of the two tipples as depreciation during the two years of its occupation of the premises. Upon Hawthorne's refusal to disclose to the Clerk of Wise County, Virginia, the consideration for the Lease and Option, recordation was denied.

During the time Hawthorne had possession of the premises it constructed a domestic tipple costing $41,252.37 and a railroad tipple costing $15,077.53. It placed on the premises a large crusher costing $2,800; installed a boiler and heating plant, as well as a plumbing system in the office building and made certain other improvements. The domestic tipple was built on concrete piers that extended four feet in the ground, with steel rods placed in the concrete. Its upright timbers, eight by eight inches in size, and larger, of green, rough oak timber, were drilled for the steel rods placed in the concrete piers. It was seventy-five feet high and approximately one hundred and twenty feet long. The railroad tipple, erected on wood sills, was smaller but built of substantial material of a similar nature. The timbers of both tipples were bolted together and nailed with forty and sixty penny nails. The siding on the tipples consisted of aluminum strips put on with screw nails. According to the testimony, the nails and bolts in the green lumber rust quickly and can not be removed without splitting the timbers, or cutting them off above the ends of the nails. The screw nails in the siding cannot well be removed.

W. A. Thompson, who was in charge of the construction of the two tipples, said the buildings could not have been made more permanent unless their timber uprights had been set in the soft concrete, and then they would have rotted. Seven months were required by a crew of from five to fifteen men to erect the tipples.

According to a statement filed on behalf of Bolling his loss and damage amounted to $38,000 for expenditures required to put the property in operation as a going concern.

Kelley testified that during the negotiations leading up to the final form of the agreement the words "equipment, improvements and

machinery" were discussed at some length by all interested parties; that it was contemplated the small tipple would be installed next to the railroad siding which was already in existence, and the domestic tipple would be built where some work had been started by Bolling; that it was agreed in the event it was necessary to cancel the lease, or upon failure to exercise its option to purchase, Hawthorne would have the right to remove all equipment, improvements and machinery put by it on the property, and that in the discussion it was further agreed that the word "improvements" contemplated a permanent fixture to the property which, under ordinary circumstances, could not be removed.

Sullivan, the Vice-President of Hawthorne, testified that it was his understanding Hawthorne was buying the property; that the tipples were to be built and fastened to the land; that he never heard anything about removing them; that no instructions were given to him to build them in sections so that they could be removed; but that there was an understanding the machinery placed on the premises would be appraised, and if the price was not satisfactory to Bolling, it could be retained by Hawthorne.

It appears that prior to the sale, Bolling had expended $2,250 on a railroad sidetrack to the site of the railroad tipple, which he had already started to build. Holes had been dug for concrete piers. Several concrete forms had been built, and heavy lumber for the construction of the tipples had been delivered to the site at a cost of more than $2,000. Hawthorne completed the construction of this tipple, one of the two structures here involved.

It was undisputed that $2,000 per month was a fair and reasonable rental for the premises.

The evidence is not in material conflict as to the nature, character and construction of the tipples, or that they, together with the boiler, heating system and the plumbing fixtures, were intended to constitute permanent additions or improvements to the plant and were constructed and installed as such. The preponderance of the evidence is that it would cost as much, if not more, to tear down the tipples and remove them to another site as to erect tipples of new material.

It is clear that the coal and coke plant was not turned over to Bolling in as good condition in all particulars as when received by Hawthorne, and that it was not in a condition to operate as a going concern. Officers and representatives of Hawthorne con-

ceded that parts of the boiler and heating system and the plumbing fixtures could not be well removed without damage to the buildings in which they were contained; while Bolling admitted that certain equipment and machinery belonged to Hawthorne and was subject to its removal upon its compliance with the terms of its contract.

The only real conflict in the evidence is that between Kelley and W. A. Thompson, who succeeded Sullivan in the management of the plant, on one side and Bolling on the other, relating to the alleged oral agreement and understanding between H. L. Thompson and Bolling that the tipples and permanent improvements were not to be removed from the land. W. A. Thompson, however, was not present during the discussions between H. L. Thompson and Bolling, either before or at the time of the execution of the written instruments. Kelley was not present when Bolling said that he and H. L. Thompson agreed upon the terms and details of the transaction prior to July 5th. H. L. Thompson did not testify in the case, and it is argued that his failure to appear and testify contrary to the evidence of Bolling creates a presumption that his testimony would have been adverse to Hawthorne. *McGehee* v. *Perkins*, 188 Va. 116, 126, 49 S. E. (2d) 304.

Bolling assigns seventeen errors to the action of the trial court, many of which assignments overlap. The primary question, however, is the ownership of two tipples, the boiler and heating plant, and plumbing fixtures placed on the premises by Hawthorne. Bolling concedes that Hawthorne has a right to "remove all improvements of the same class and type as 'equipment and machinery,'" when such removal will not damage the realty. Hawthorne contends that it has a right to remove all improvements placed by it on the property whether they were permanently attached to the freehold or not. In its brief and argument at the bar of this Court, it further contends that the items in dispute constitute "trade fixtures" and as such are removable by it as a tenant of the leased premises, citing a number of cases and authorities. It denies that the transaction constituted a sale, that there is any ambiguity or conflict between the two written instruments involved, and that it had any oral agreement with Bolling that the structures, improvements, or fixtures in question should belong to him, if the contract was not fully consummated.

The contentions of the parties raise three questions: (1) whether the transaction between the parties was one of bargain and sale re-

sulting in a contract of conditional sale, or merely a lease with option to purchase; (2) whether the provisions of the two instruments are conflicting and ambiguous; and (3) if the contract is ambiguous, who is entitled to the ownership of the tipples, the boiler and heating plant, and plumbing fixtures, in question.

In view of what will be hereinafter said, we do not think that the law relating to "trade fixtures" as between landlord and tenant is involved. Here we are concerned as to whether the parties by an agreement between themselves fixed the character and ownership of the property involved. It is well settled in Virginia that the parties to an agreement may fix the character and ownership of property which, in the absence of a contract would be held to be a fixture, where no absurdity or general inconvenience would result from the transaction. *Tunis Co.* v. *Dennis Co.*, 97 Va. 682, 687, 34 S. E. 613.

It is conceded that the two instruments constitute one and only one contract relating to the same subject matter. They must be regarded as parts of one transaction and receive the same construction as if their several provisions were in one and the same instrument. *Portsmouth Refining Corp.* v. *Oliver Refining Co.*, 109 Va. 513, 64 S. E. 56, 132 Am. St. Rep. 924; *Luck* v. *Wood, et al.*, 144 Va. 355, 132 S. E. 178; *Texas Co.* v. *Northup*, 154 Va. 428, 153 S. E. 659.

Did the contract between the parties constitute a lease, a lease with option to purchase, or a contract of conditional sale? The solution of this question is to be reached upon a close scrutiny of all of the provisions of the two instruments and the consideration of them as a whole. The answer is not to be found in the name which the parties gave to the instruments, and not alone in any particular provision they contain, disconnected from all others; but in the ruling intention of the parties gathered from the language they used and the circumstances surrounding its use. We must look to the purpose of the instruments, their substance and not their form. Merely giving to them a particular name or form did not take away the nature and effect of the transaction. Where it is doubtful whether a paper constitutes an agreement of sale, a lease, or a lease with option to purchase, the pertinent and explanatory circumstances, correspondence, dealings and negotiations leading up to and surrounding the execution of the contract are properly admissible in evidence. *Arbuckle Bros.* v. *Gates & Brown*, 95 Va. 802, 805, 30

S. E. 496; *Turner and Happersett* v. *Hall and Connor*, 128 Va. 247, 254, 104 S. E. 861; *Murch* v. *Wright*, 46 Ill. 487; *Phelan* v. *Stockyards Bank*, 134 Okl. 13, 276 P. 175; *Crowell* v. *Brim*, 191 Ga. 288, 12 S. E. (2d) 585; *Heryford* v. *Davis*, 102 U. S. 235, 26 L. ed. 160.

Here it is not denied that at the time the instruments were executed the purchase of the property by Hawthorne was contemplated. The instruments, however, show a studied attempt to give the transaction the form and appearance of a lease; but the obvious purpose and the natural effect were to consummate a contract of conditional sale. If there was merely a lease, Hawthorne would hardly have paid $24,000 in cash at the time of the execution of the instruments, expended more than $60,000 on permanent structures and fixtures, and agreed to pay monthly installments of $4,000, when the fair monthly rental of the premises was not more than $2,000. The written instruments were in pursuance of an attempt to create the appearance of the relation of landlord and tenant between the parties, and at the same time constitute the relation of vendor and vendee. In this respect they were ambiguous and capable of being understood in more than one sense. They had in them elements of a conditional sale, and they savored of a lease in some respects.

■ Are any of the several provisions of the two instruments in conflict? Clause 6 of the Lease and Option provides that "in the event of the termination of this Lease and Agreement, Lessee shall turn over the property and all improvements, fixtures and equipment thereon to Lessors, as a going concern, and in shape to operate, in as good condition as when received from Lessors, reasonable wear and tear excepted." Clause 6 of the Agreement provides that, "In the event of the cancellation or failure of Hawthorne to exercise the option to purchase the property, all property set forth in the 'Lease and Option' is to be turned over to Bolling in as good condition as when turned over to Hawthorne, reasonable wear and tear excepted." Then this clause goes on to say that "In the event of such cancellation or failure to exercise the option to purchase, Bolling shall have the exclusive right for 90 days, to purchase all equipment, improvements and machinery placed on the property by Hawthorne, * * *" and that "In the event Bolling does not elect to purchase such equipment, improvements and machinery, Hawthorne shall have the right to remove the same, provided all past due rentals are paid and the properties are left in a condition to operate as a going concern."

In the third clause of the Lease and Option, it is provided that if

Hawthorne shall fail to pay the "rental" when due or within thirty days after written notice of default, Bolling may at his option terminate all rights of Hawthorne thereunder, and Bolling shall become "entitled to possession of the lands, together with all improvements, machinery, equipment and all property of every kind and nature thereon."

The words "the property" in Clauses 6 of the Agreement and Lease and Option obviously refer to the real estate conceded to be owned by Bolling. In its petition, Hawthorne prays for the construction and interpretation of the words "equipment, improvements and machinery" in Clause 6 of the Agreement. Our inquiry will, therefore, be directed to what the parties really meant by the use of the above three words. In the sixth Clause of the Lease and Option Bolling became entitled to the "property and all improvements, fixtures and equipment thereon, as a going concern, * * * in as good condition as when received from Lessee," etc., in the event of the *termination of the Lease and Agreement,*" and in the third Clause of that instrument became entitled to the "lands, together with all improvements, machinery, equipment and all property of any kind and nature thereon," upon *default of the payment of the monthly installments.* (Emphasis added.)

In the agreement it is provided that, in the event of "cancellation or failure of Hawthorne to exercise the option to purchase *the property, all property set forth in the Lease and Option* is to be turned over to Bolling *in as good condition as when turned over to Hawthorne.*" It is then added that in the event of such cancellation or failure to exercise the option, *Bolling shall have the exclusive right to purchase "all equipment, improvements and machinery placed on the property by Hawthorne* at a price to be determined * * *." Then is added the proviso that if *"Bolling does not elect to purchase such property Hawthorne shall have the right to remove the same, provided all past due rentals are paid and the properties are left in a condition to operate as a going concern."* (Emphasis added.)

Under Clause 4 of the Agreement, Hawthorne was given "the right to purchase all property set forth in the Lease and Agreement, including *any additions thereto, at the operation of 48 months from date, at a price to be determined by Hawthorne,* in its sole and absolute discretion, provided that all past due rentals are paid in full." (Emphasis added.) Undoubtedly, the struc-

tures erected by Hawthorne and the heating and plumbing systems were additions to the property, constituting improvements thereon, and were to be included in the sale of the plant in the event Hawthorne exercised its option to purchase, possibly at the price of $1.00. It is difficult to understand why it was necessary to make a provision for Hawthorne's "purchase" of "any additions" to the property at the expiration of 48 months, if the "additions" were to be regarded as "improvements" removable by it upon the exercise of its right to cancel at that time, under the very next clause of the agreement.

In the fourth clause of the Lease and Option the specific words "buildings, structures and personal property" are employed. In the fifth clause we find "buildings and structures", as well as "houses." In the sixth clause the word "fixtures" is included between "improvements" and "equipment" as characterizing the property to be turned over to Bolling. In the ninth clause reference is made to the replacement of "machinery, equipment and personal property." In the granting clause of the Lease and Option, we find the words "all buildings, improvements, rights."

Following the description of the real estate involved, the following language is used in the Lease and Option:

"Together with all coke ovens, equipment, machinery, supplies, accessories and personal property, including parts, tools, furniture, *fixtures, tipple, tipple machinery* and parts, tracks and all other incidental equipment and *attachments on said land, whether attached to the realty or not*, used by Lessors in the operation of the coal, coke and store business." (Emphasis added.)

A few lines further reference is made to "all real and personal property, the *equipment*, supplies, *buildings, fixtures and any other property*, used by Lessors in the operation of the said business." (Emphasis added.)

In the agreement only is there a provision giving Hawthorne the right to remove "equipment, improvements and machinery" placed by it on the premises, and that is based on the happening of a specific event and upon its compliance with the several conditions specified in the contract.

In Black's Law Dictionary, DeLuxe Edition, the word "improvements" is defined as "A term used in leases, of doubtful meaning. It would seem to apply principally to buildings, though generally it extends to the amelioration of every description of property, whether

real or personal; but, when contained in any document, its meaning is generally explained by other words." Here its meaning is somewhat cloudy and confused by its inclusion between the words "equipment" and "machinery," and in one instance by the substitution of the word "fixtures." Where there is doubt as to its meaning, the sense in which it is used must be gathered from the context and the subject matter of the instrument or writing in which it is used. See "Improvement," Permanent Edition, Vol. 20, Words and Phrases, pages 313 *et seq.*

The obvious inconsistencies, conflicts and ambiguities in the two instruments support the contention of Bolling that their provisions create doubt as to the real meaning and interests of the parties, and require that extrinsic evidence should be received in explanation.

The preliminary negotiations between the parties and the meaning of the language used in connection with the surrounding facts and circumstances are to be considered not for varying or contradicting the plain terms of the instruments; but in order to determine the real meaning and intention of the makers of the instruments. In this consideration, the Court, as nearly as possible, must place itself in the position of the parties, in order to arrive at a proper construction of their contract. *Ford* v. *Street*, 129 Va. 437, 106 S. E. 379; *Virginian Ry Co.* v. *Avis*, 124 Va. 711, 98 S. E. 638; *Cary* v. *N. W. Mut. Life Ins. Co.*, 127 Va. 236, 103 S. E. 580; *Jones* v. *Gammon*, 140 Va. 704, 125 S. E. 681.

In the construction of contracts "the academic definition of words is often important, but more important still is the purpose of the covenant." *Krikorian* v. *Dailey*, 171 Va. 16, 24, 197 S. E. 442.

In determining whether chattels used in connection with realty are to be considered as fixtures, "In the absence of any specific agreement between the parties as to the character of a chattel placed upon the freehold, the three general tests are as follows: (1) Annexation of the chattel to the realty, actual or constructive; (2) Its adaptation to the use or purpose to which that part of the realty to which it is connected is appropriated; and (3) The intention of the owner of the chattel to make it a permanent addition to the freehold." *Danville Holding Corp.* v. *Clement*, 178 Va. 223, 232, 16 S. E. (2d) 345; *Mullins* v. *Sturgill*, 192 Va. 653, 658, 66 S. E. (2d) 483.

■ It follows that the trial court erred in holding that there was no conflict between the provisions of the two instruments with reference to the ownership of the improvements placed upon the

premises by Hawthorne, whether the agreement between the parties constituted a lease, a lease with option to purchase, or a conditional sale. The controlling question is what was the agreement between the parties as to the removal or non-removal of the improvements placed on the property by Hawthorne. In determining that question we are governed by the law of contracts and not by the law of fixtures.

In our opinion, the evidence shows that the agreement between the parties constituted a contract of conditional sale; that H. L. Thompson, the President of Hawthorne, agreed to purchase the plant from Bolling, paying for it partly by cash, and the balance in monthly installments, with the understanding that if the contract was terminated or cancelled by it, Bolling was to be entitled to the tipples and other permanent improvements placed by it on the premises; that Hawthorne was entitled to all personal property, placed by it on the premises, not permanently annexed to the realty; that Hawthorne did not turn back the plant to Bolling "as a going concern, and in shape to operate, in as good condition as when received, reasonable wear and tear excepted;" and that Bolling is entitled to such damages as he incurred by reason of such default.

For the foregoing reasons, the decree of the trial court of August 16, 1954, is reversed, and the case remanded for such further proceedings as may be necessary and proper, in accordance with the views herein expressed, and for any other matter or thing deemed relative or pertinent to the determination of the rights of the respective parties.

*Reversed and remanded.*