MARCIA P. DYKES, ET AL.

V.

NORTHERN VIRGINIA TRANSPORTATION DISTRICT
COMMISSION, ET AL.

Record No. 901033

OSGOOD TOWER

V.

NORTHERN VIRGINIA TRANSPORTATION DISTRICT
COMMISSION, ET AL.

Record No. 901037

April 19, 1991

Present: Carrico, C.J., Stephenson, Russell, Whiting, and Lacy, JJ., Poff, Senior Justice,
and Harrison, Retired Justice

MARCIA P. DYKES

V.

NORTHERN VIRGINIA TRANSPORTATION DISTRICT
COMMISSION, ET AL.

Record No. 901033

OSGOOD TOWER

V.

NORTHERN VIRGINIA TRANSPORTATION DISTRICT
COMMISSION, ET AL.

Record No. 901037

November 8, 1991

Present: Carrico, C.J., Compton, Stephenson, Whiting, Lacy, and Keenan, JJ.,
and Poff, Senior Justice

358

*James H. Falk, Jr. (Scott A. Mills; James H. Falk, Sr.; Mc-Govern, Noel, Falk, Pannone, Procaccini & O'Leary*, on briefs), for appellant. (Record No. 901033)

*Fredrick H. Goldbecker* for appellant. (Record No. 901037)

*William G. Broaddus (David T. Stitt, County Attorney; A. Robert Cherin, Deputy County Attorney; Ellen F. M. Posner, Assistant County Attorney; A. Francis Robinson, Jr.; James K. Manning; William J. Strickland; Brown & Wood; McGuire, Woods, Battle & Boothe*, on brief), for appellees. (Record Nos. 901033 and 901037)

*Amicus Curiae:* Commonwealth of Virginia; Honorable L. Douglas Wilder, Governor of the Commonwealth of Virginia, et al. (H. Lane Kneedler, Chief Deputy Attorney General; Mary Sue Terry, Attorney General; K. Marshall Cook, Deputy Attorney General; Barbara M. Rose, Senior Assistant Attorney General; Barbara H. Vann, Assistant Attorney General; Stephen Chapple, Assistant Attorney General, on brief), for appellees. (Record Nos. 901033 and 901037)

*Amicus Curiae:* Rockingham County, Virginia. (George R. Aldhizer, Jr.; Carolyn M. Perry; G. Chris Brown; Wharton, Aldhizer & Weaver, on brief), for appellees. (Record Nos. 901033 and 901037)

*Amicus Curiae:* Chesterfield County, Virginia, and City of Roanoke, Virginia. (Steven L. Micas, County Attorney; Wilburn C. Dibling, Jr., City Attorney, on brief), for appellees. (Record Nos. 901033 and 901037)

*Amicus Curiae:* Anderson & Strudwick, Inc., et al. (Harry Frazier, II; Jack Spain, Jr.; Bryar C. Nettles; Hunton & Williams, on brief), for appellees. (Record Nos. 901033 and 901037)

*Amicus Curiae:* Honorable Gloria T. Fisher, Northern Virginia Soil and Water Conservation Board, Director, et al. (Neil F. Markva, on brief), for appellant. (Record Nos. 901033 and 901037)

*Amicus Curiae:* Nancy Tower and Ernest R. Blevins. (Fredrick H. Goldbecker, on brief), for appellants. (Record Nos. 901033 and 901037)

*Amicus Curiae:* Citizens Against Pledge Bonds, Inc. (Patrick M. McSweeney; Stephen T. Gannon; McSweeney, Burtch & Crump, on brief), for appellant. (Record Nos. 901033 and 901037)

## PRIOR OPINION

JUSTICE WHITING delivered the opinion of the Court.

This is a proceeding to validate a proposed bond issue to be repaid solely by funds appropriated by a county's board of supervisors, and which is not to be submitted to a vote of the people. The issue is whether the county will incur a long-term debt proscribed by Article VII, § 10(b) of the Constitution of Virginia (Article VII, § 10(b)).

In order to finance a part of the cost of completing the Fairfax County Parkway, the Fairfax County Board of Supervisors (the county) approved a proposed contract (the contract) with the Northern Virginia Transportation District Commission (the commission). The contract would obligate the commission to issue its "Transportation Contract Revenue Bonds" (the bonds) in an aggregate amount not to exceed $330,000,000. In return, the county would agree to fund the annual principal and interest payments and other listed expenses of the bond issue, to be disbursed by a trustee.[1] These funds would come from the county's "general revenues" and from "the Business, Professional and Occupational License Tax . . . or any other revenue appropriated . . . in substitution for or in addition thereto by" the county.

However, Section 4.05 of the contract would provide that

[t]he obligation of the County to make any payments . . . is contingent upon the appropriation for each fiscal year by the Board of Supervisors of the County of funds from which such payments can be made. The County shall not be liable for any amounts that may be payable pursuant to this Contract unless and until such funds have been so appropriated for payment and then only to the extent thereof. It is understood and agreed by the parties hereto that nothing in this Contract shall be deemed to obligate the Board of Supervisors of the County to appropriate any sums on account of any payments to be made by the County hereunder. This Contract shall not constitute a pledge of the full faith and credit of Fairfax County or a bond or debt of Fairfax County in viola-

---

[1] Subject to a reserved right not to make the appropriations, the county also would pay the commission's listed expenses.

tion of Section 10 of Article VII of the Constitution of the Commonwealth.

As security for the payment of the bonds, the commission would transfer its interest in the contract by a proposed trust agreement (the trust agreement). The trust agreement, and the bonds themselves, would provide that "[t]he Bonds are limited obligations of the Commission payable solely from" the moneys provided to the Trustee by the County. The trust agreement further would provide that "[t]he obligation of the County . . . to make such payments . . . is subject to and contingent upon the annual appropriation by the County of moneys for such purpose."

On May 4, 1990, pursuant to the provisions of Code § 15.1-214, the commission and the county, as a "Plaintiff/Intervenor" (the plaintiffs), filed this bond validation proceeding against the "[t]axpayers, property owners and citizens" of Fairfax County and other localities serviced by the commission. Osgood Tower, Marcia P. Dykes, and "John Doe and Jane Doe numbers 1-25," Fairfax County citizens and taxpayers (the taxpayers), opposed the bond validation.

On July 12, after extended hearings and argument, the trial court validated the proposed bond issue. The taxpayers appeal.

■ The taxpayers argue that because the indebtedness represented by the bond issue would extend for a period beyond the fiscal year of its proposed year of issue, it would be a long-term debt contracted by the county without voter approval. Therefore, the taxpayers contend that the bond issue would violate the following provision of Article VII, § 10(b):

No [long-term] debt shall be contracted by or on behalf of any county . . . except by authority conferred by the General Assembly by general law. The General Assembly shall not authorize any such debt [except listed debts not relevant here] unless in the general law authorizing the same, provision be made for submission to the qualified voters of the county or district thereof or the region or district thereof, as the case may be, for approval or rejection by a majority vote of the qualified voters voting in an election on the question of contracting such debt. Such approval shall be a prerequisite to contracting such debt.

The plaintiffs respond that the financing plan would not violate Article VII, § 10(b) because they say that contracts subject to appropriation and bonds payable solely from payments pursuant to such contracts are not 'debts' as prohibited by the Virginia Constitution. Here, the plaintiffs seek to extend the scope of what is known as the "special fund" exception to constitutional limitations upon incurring long-term governmental debts without voter approval.

■ In a case dealing with a long-term state debt and analogous constitutional limitation upon the state's power to incur such debts, we summarized the special fund exception by quoting from *Miller v. Watts*, 215 Va. 836, 841, 214 S.E.2d 165, 169 (1975):

> [N]o constitutionally prohibited indebtedness is created when bonds issued to finance a particular State capital project are to be paid solely from a *special fund derived from the revenues of that project; when the legislature is not obligated to appropriate funds for payment of the indebtedness*; and, when the indebtedness is not secured by the general faith, credit, and taxing power of the State.

*Baliles v. Mazur*, 224 Va. 462, 469-70, 297 S.E.2d 695, 699 (1982) (emphasis added).

■ The plaintiffs rely upon three cases in which an analogous constitutional limitation was considered in connection with long-term indebtednesses proposed for the state's benefit. In those cases, we held that those indebtednesses would not be within the constitutional limitations because they were to be paid solely from special funds derived from the revenues of the financed projects. *Baliles*, 224 Va. at 466, 297 S.E.2d at 697 (rent for government's use of office and other buildings); *Harrison v. Day*, 202 Va. 967, 970, 121 S.E.2d 615, 617 (1961) (rent for use of port facilities); *Almond v. Gilmer*, 188 Va. 822, 840, 51 S.E.2d 272, 279 (1949) (toll fees and other charges earned by bridges and ferries). Here, there is no special fund because *no* income will be derived from the use of the Parkway; the *only* source of revenue for bond payments will be the county's annual appropriations from its occupational license receipts and other state revenues.

The plaintiffs contend that this would make no difference because we said in *Baliles* that "[t]he overriding consideration, therefore, is whether the legislative body is obligated to appropri-

ate the funds, not the source or composition of the special fund." 224 Va. at 471, 297 S.E.2d at 700. That statement, however, was made in response to a contention that the "special fund" doctrine could not be applicable in *Baliles* because the rent to be paid by the Commonwealth for its use of the buildings was a "fund consist[ing] entirely of money appropriated by the legislature." *Id.* As noted above, however, *Baliles* concerned a revenue-generating project and is therefore inapposite. Thus, this is the first case in which we have considered the implications of Article VII, § 10(b) in circumstances where the facility financed will not be a revenue-generating project.

In *Terry* v. *Mazur*, 234 Va. 442, 362 S.E.2d 904 (1987), we considered a statutory scheme purporting to authorize the Commonwealth Transportation Board to issue revenue bonds to finance highway improvements. The bonds were to be secured by a "pledge" of future excise and other taxes, as well as fees relating to motor vehicles. The Attorney General contended that the bond issue met the requirements of the "special fund" doctrine, and was therefore constitutionally permissible without submission to a vote of the people. We disagreed, refusing to extend the "special fund" doctrine to projects other than those which generate their own revenues. *Id.* at 455, 362 S.E.2d at 911. We adhere to that view.

The plaintiffs also contend that the bonds would not be a "debt" of the county because the bonds would be issued by the commission, not by the county. That, in our view, is a mere subterfuge. Because the trust agreement and the bonds themselves look to annual appropriations of the county's funds as the sole source for repayment of the bonds, it is of no consequence that bonds would be issued by the county's *alter ego.* "We must look to the purpose of the instruments, their substance and not their form. Merely giving to them a particular name or form [does] not take away the nature and effect of the transaction." *Bolling* v. *Hawthorne Coal Co.,* 197 Va. 554, 566, 90 S.E.2d 159, 168 (1955).

Although the contract permits the county to discontinue its promised appropriations, we must also consider the practical effect of such a calamitous event in deciding whether the county in fact would be bound to continue to service the bond issue and, therefore, has incurred a "debt" proscribed by Article VII, § 10(b). The county recognizes the importance of its fiscal integrity. It has been advised that the bond issue would not affect its triple A bond

rating. In fact, the contract would prohibit the county from changing its designation of the proceeds of its annual business, professional, and occupational tax as the primary source of appropriations for its annual bond payments without obtaining "confirmation from those rating agencies that shall have . . . rated and maintained ratings on the Bonds, that the then current ratings on the Bonds will not be reduced as a result of such change."

■ The county also recognizes the disastrous effect that would follow any failure by the board of supervisors to make an annual appropriation and the county argues that such a disaster would never be permitted to occur. That argument implicitly acknowledges that the bond issue would have the practical effect of a long-term debt binding the county.

■ The predecessor to Article VII, § 10(b) was adopted "[t]o safeguard the credit and *fiscal integrity* of the counties." II A. Howard, Commentaries on the Constitution of Virginia 863 (1974) (emphasis added). In explicating the predecessor to Article VII, § 10(b), we said that

approval by a majority of the citizens voting on the question properly submitted to them, is a prerequisite to the power of the board of supervisors to create an obligation for any purpose, payable at some future time beyond the termination of the current fiscal year. In no other way, directly *or indirectly*, can the board bind the county on any such obligation.

*American-LaFrance and Foamite Industries, Inc.* v. *Arlington County*, 164 Va. 1, 9, 178 S.E. 783, 786 (1935) (emphasis added).

■ The plaintiffs here impermissibly seek to accomplish indirectly what they cannot do directly. *See, e.g., Hart* v. *Commonwealth*, 221 Va. 283, 290, 269 S.E.2d 806, 811 (1981); *Foti* v. *Cook*, 220 Va. 800, 807, 263 S.E.2d 430, 434 (1980). It is obviously contemplated that the issuance of the bonds in accordance with the contract would bind future boards of supervisors to make annual appropriations of sufficient funds to finance the bonds. Manifestly, the animating purpose of the bond contract arrangement is to create a long-term debt, without submitting the debt to a vote of the qualified voters of Fairfax County.

■ We hold, therefore, that the obligation thus incurred would be a "debt contracted by the county" in violation of Article VII, § 10(b) and, hence, that the bond issue would be invalid. Accord-

ingly, we will reverse the judgment of the trial court and enter final judgment invalidating the bond issue.

CHIEF JUSTICE CARRICO, dissenting.

I disagree with the majority. I have great difficulty, however, in stating the basis of my disagreement because I have even greater difficulty in discerning upon what basis the majority invalidates the bonds in question.

The majority concedes that "the contract permits the county to discontinue its promised appropriations." That should be the end of the case. Yet, continuing its search for a basis to invalidate the bonds, the majority says that the Court "must . . . consider *the practical effect* of [the county's discontinuance of its promised appropriations] in deciding whether the county in fact would be bound to continue to service the bond issue and, therefore, has incurred a 'debt' proscribed by Article VII, § 10(b)." (Emphasis added.)

The majority notes the county's recognition of "the importance of its fiscal integrity" as well as "the disastrous effect that would follow any failure by the board of supervisors to make an annual appropriation." then, opining that the county "impermissibly seek[s] to accomplish indirectly what [it] cannot do directly," the majority says it is obvious that "the issuance of the bonds in accordance with the contract would bind future boards of supervisors to make annual appropriations of sufficient funds to finance the bonds."

It might be obvious to the majority that the county would be bound to make annual appropriations of sufficient funds to finance the bonds, but it is not obvious to me. This is what the majority is saying: The practical effect of the county's exercise of its contractual right to discontinue the promised appropriations is to make it legally obligated to continue the promised appropriations.

I thought I knew what the term "practical effect" meant. I also thought I knew what the term "legally obligated" meant. And, to me, the two terms meant quite different things. Much to my surprise and dismay, however, the majority says the two terms mean the same thing, and I daresay the business and financial communities in this state will be equally surprised and dismayed at the majority's revelation.

It appears, therefore, that "practical effect' is the basis of the majority's invalidation of the bonds in question. If that is the basis, I consider it far too slender a reed to support such drastic action.

Rather, in my opinion, the bonds should be invalidated only if the county has undertaken an unconditional express obligation to continue making appropriations to pay the full amount of the bonds. I do not believe the county has undertaken such an obligation, and I would say this whether or not a special fund exists in this case.

The majority fails to even cite, let alone give effect to, important statutory provisions applicable to the transaction involved in this case. Code § 15.1-1358.2(a)(2) provides that "[t]he bonds and other obligations of a [transportation] district (and such bonds and obligations shall so state on their face) shall not be a debt of the Commonwealth or any political subdivision thereof and neither the Commonwealth nor any political subdivision thereof other than the district shall be liable thereon." furthermore, pursuant to Code § 15.1-1364(b), except for claims cognizable under the Virginia Tort Claims Act, "the obligations and any indebtedness of a [transportation district] commission shall not be . . . a debt or liability of the Commonwealth, or of any county or city . . . either legal, moral or otherwise."

Furthermore, the contract between the county and the commission provides that "nothing [therein] shall be deemed to obligate the Board of Supervisors of the County to appropriate any sums on account of any payments to be made by the County [thereunder]" and that the contract "shall not constitute a pledge of the full faith and credit of Fairfax County." And each bond proposed to be issued by the commission will bear the disclaim of the county's liability, as required by Code § 15.1-1358.2(a)(2).

I, too, think the Court should look to the "substance and not [the] form" of the pertinent documents in this case. *See Bolling* v. *Hawthorne Coal Co.*, 197 Va. 554, 566, 90 S.E.2d 159, 168 (1955). But I think the Court must also look to the substance of applicable statutory provisions in determining the *real effect*, rather than the mere practical effect, of the documents in question. And, when I look at the case in this way, I do not see the evil the majority seems to find lurking behind every word the parties have used to express their undertaking.

Nor do I understand how, in the face of all the indicia of non-indebtedness present in the statute, the contract, and the bonds involved in this case, the majority can conclude that the county has incurred binding indebtedness in violation of Article VII, § 10(b). In reaching this conclusion, the majority has taken a mighty leap in logic to get where it wants to go. This is too great a leap for me, and I dissent.

JUSTICE LACY, concurring.

This Court has come too far in its consideration of the constitutionality of financial obligations undertaken by state and local governments to declare today that an obligation is a debt for purposes of Article VII, § 10(b) of the Virginia Constitution when the obligation is only a conditional promise to pay, it is admitted by the parties to be only a moral obligation, and cannot be enforced through any legal process. This holding allows the "disastrous effect" of the failure to perform to create a *legal* obligation and directly contradicts the holdings and statements made by this Court in numerous prior cases, without any attempt to address, distinguish, or overrule them. *E.g., Terry* v. *Mazur*, 234 Va. 442, 451, 362 S.E.2d 904, 909 (1987); *Baliles* v. *Mazur*, 224 Va. 462, 469, 297 S.E.2d 695, 698-99 (1982); *Harrison* v. *Day*, 202 Va. 967, 975-77, 121 S.E.2d 615, 620-22 (1961); *Almond* v. *Gilmer*, 188 Va. 822, 840-41, 51 S.E.2d 272, 279 (1949). This is the first instance in which the repayment of bonds is totally dependent on a conditional promise of the governmental unit. Although the "practical effect of such a calamitous event" on the governmental unit should it choose not to keep its promise to appropriate funds was no less present in these prior cases, it did not transform a conditional appropriation into a debt under Article VII, § 10(b). *Baliles* v. *Mazur, supra.*

I agree with the majority's analysis of the special fund doctrine as it applies to this case. I cannot accept the rationale by which the majority reverses the trial court's judgment. The county's promise to pay, which does not have to be kept, although the basis for the security underlying the bonds, nonetheless, does not legally obligate the county to appropriate sums for payment of a debt beyond one year and, therefore, does not run afoul of the constitu-

tional prohibition.* Nevertheless, I concur in the result the majority reaches because the contract between the county and the commission violates the Transportation District Act of 1964, Va. Code §§ 15.1-1342, *et seq.*

The Act was passed to allow the provision of transportation services and facilities on a regional basis. As reflected in the Act, effective planning and provision of a transportation infrastructure "cannot be achieved by the unilateral action of the counties." Code § 15.1-1343. The Act is not structured simply to provide a county with a financing mechanism for its own facilities, facilities in which the district commission has no interest whatsoever. In this regard, the district commission is similar to the Ports Authority and Public Building Authority. These entities were created to undertake certain types of projects which would provide directly, or through sale or lease, certain services and facilities.

Consistent with this purpose § 15.1-1359 allows the county to enter into contracts with the commission "pursuant to which . . . [the commission] . . . undertakes to provide the transportation facilities specified in a duly adopted transportation plan, and/or to render transportation service." Here, the commission is neither providing transportation facilities nor rendering transportation services to the county. It is only providing money to the county which in turn will construct the facilities, own them, and use them to provide transportation services. Code § 15.1-1359 does not authorize the county to enter into a contract with the commission where neither transportation service nor facilities are to be provided by the commission. Therefore, in my opinion, the contract at issue is invalid because it violates the Act.

I believe the contract also violates § 15.1-1364(b), which provides that the obligations and indebtedness of a commission "shall not create . . . any . . . obligation . . . of any . . . county . . . either legal, moral or otherwise . . . ." The majority, the appellants, the Attorney General, and even the appellees acknowledge the the contract imposes *some* type of obligation on the county. In fact, the Attorney General and the appellees have labeled the obligation a "moral" one. Furthermore, the contract obligates the county to hold the commission harmless from any liability or ex-

---

* Apparently, financial analysts and bond counsel consider the detriments of non-performance by the county to be so great that this promise, although not legally binding, provides sufficient security to potential bondholders to endorse the sale and purchase of the bonds.

pense "arising out of or in connection with this contract or the Bonds or the Trust Agreement."

Section 15.1-1364 is not a mere repetition by the General Assembly assuring that a commission obligation would not be "deemed to be" or interpreted as the legal obligation of a county or city subject to the constitutional limitation. *See, e.g.*, § 15.1-1358.2(a)(2). Rather, this section prohibits creating such an obligation *in fact*, precisely to preclude the type of circumvention of statutory and constitutional provisions attempted here. The obligation of the commission to repay the $330,000,000 bonded indebtedness as reflected in the bond, trust, and contract documents creates and obligation, "moral or otherwise," on behalf of the county and, therefore, does not comply with the provisions of the Act.

Finally, the concluding proviso of § 15.1-1364(b) states that "nothing in this chapter . . . shall be construed to authorize a commission . . . to incur any indebtedness on behalf of or . . . obligate the . . . county . . . ." Thus, the General Assembly has stressed again that the commission's actions under the statute must comply with the law of the Commonwealth. The commission's obligations as reflected in the contract do not comport with this statutory provision. Therefore, both the county and the commission are precluded from executing the instant contract under the terms of the Act.

If the trial court's decree validating the bonds in issue is sustained, it is conclusive as to the validity of the "means provided for the payment of such bonds and the validity of all pledges of revenues and of all covenants . . . ." Code § 15.1-220. For the reasons set out above, I believe the contract offered as security for the bonds is invalid and, therefore, the judgment of the trial court must be reversed.

## UPON REHEARING

### Marcia P. Dykes

v.

### Northern Virginia Transportation District Commission, et al.

Record No. 901033