# 𝔖taunton

A. S. HARRISON, JR., ATTORNEY GENERAL OF VIRGINIA (FREDERICK
T. GRAY, PRESENT ATTORNEY GENERAL, SUBSTITUTED PETITIONER)
v. SIDNEY C. DAY, JR., COMPTROLLER OF VIRGINIA.

September 8, 1961.

Record No. 5304.

Present, All the Justices.

*Charles L. Kaufman, Special Assistant to the Attorney General (A. S. Harrison, Jr., Attorney General; Kenneth C. Patty, Assistant Attorney General; William P. Oberndorfer; Hamilton Plack*, on brief), for the petitioner.

*Aubrey R. Bowles, Jr. (Bowles, Boyd & Herod*, on brief), for the respondent.

Buchanan, J., delivered the opinion of the court.

In *Harrison* v. *Day*, 200 Va. 764, 107 S. E. 2d 594, we held to

be constitutional the 1958 Act of Assembly (Enabling Act) which created the Virginia State Ports Authority and defined its rights, powers and duties, which are, generally, to acquire, construct and operate the harbors and their port facilities within the State and to issue revenue bonds for these purposes. Acts 1958, ch. 174, codified as §§ 62-106.1 through 62-106.19 of the 1950 Code. In that case the Comptroller questioned the constitutionality of appropriating State funds "to aid the Authority in the development of firm proposals for the acquisition and construction of port terminals and facilities by the Authority for presentation to the General Assembly." Acts 1958, ch. 642, item 24, p. 971. For reasons stated in the opinion we held:

"Since the acquisition, development and operation of port and harbor facilities contemplated at Hampton Roads is a proper governmental function, our conclusion is that the statutes involved are not violative of § 185 of the Constitution of Virginia. It being a governmental function, the appropriation is for a public purpose and not a private purpose, and hence the statutes are not repugnant to § 188 of the Constitution of Virginia."

At the 1958 session the General Assembly adopted House Joint Resolution No. 70 (Acts 1958, p. 1104), which stated *inter alia* that the continuing development of the ports of Virginia is essential in any program of economic or industrial development of the Commonwealth, and directed the Authority to proceed to obtain facts and information regarding the cost of acquisition and construction of port terminals and facilities for presentation to the Governor and General Assembly at the 1960 session.

Thereafter the Authority entered into negotiations with the Norfolk and Western Railway Company, which owned and operated marine terminals in Hampton Roads, and obtained from it a written proposal which involved a sale to the Authority of the Railway's facilities, the construction by the Authority of new facilities, the lease of the combined facilities to the Railway at a rental sufficient to amortize revenue bonds to be issued by the Authority to obtain funds necessary for the proposed purchase and construction.

After being informed of the proposal the General Assembly, at its 1960 session, appropriated $1,646,750 for the biennium to the Authority "For acquisition, development, construction and operation of port facilities."

At the same session the Assembly amended Code § 62-106.8 (b) of the Enabling Act by adding thereto the words shown in italics,

so as to provide that the Authority "without pledging the faith and credit of the Commonwealth of Virginia":

"(b) Is authorized and empowered to rent, lease, buy, own, acquire and dispose of such property, real or personal, as the Authority deems proper to carry out the purposes and provisions of this chapter, all or any of them and to issue revenue bonds for buying or acquiring such property; *and to lease to another such part or all of its property, real or personal, for such period or periods of years, upon such terms and conditions, with or without an option on the part of the lessee to purchase any or all of the leased property at such price, at or after the retirement of all indebtedness incurred by the Authority on account thereof, as the Authority shall determine.*"

Thereafter the Authority entered into a Port Facility Contract (Contract) with the Railway for the purchase of property at Sewells Point and Lamberts Point, in Norfolk, for the construction thereon by the Authority of new port facilities and improvements; the issuance and sale by the Authority of its revenue bonds to defray the cost of the acquisition and construction, to be secured by a Trust Agreement and by a Lease by the Authority to the Railway of said property.

The Lease is for a term of thirty years at a rental not to exceed $60.6 million, payable in semi-annual installments sufficient to enable the Authority to pay when due all the principal, interest and redemption premiums payable on the revenue bonds, and to make any other deposits required by the Trust Agreement. If the bonds are fully retired prior to the end of the original term, the rent thereafter payable by the Railway will be reduced to an extent agreed on by the parties, or, failing such agreement, to the extent determined by a formula set forth in the Lease.

The Railway is to operate the leased premises as general cargo port terminal facilities for use by the general public on a fair and reasonable basis, free of any unjust or unreasonable discrimination, at charges and with regulations to be fixed by the Railway on a fair and reasonable basis. If the Railway should realize a profit from the operation, the Authority is to receive a portion thereof determined in accordance with a formula set out in the lease. No part of any operating loss is to be borne by the Authority.

The Railway is given the option to renew the Lease for two periods of thirty years each, at rentals and on terms and conditions to be agreed on, together with an option to purchase at the expiration of the original or renewal terms at a price determined by a formula set out in the lease, but only after all the revenue bonds have been paid.

The principal and interest of the revenue bonds are payable solely from the revenues derived by the Authority from the port facilities. It is required that they shall contain on their face a statement to the effect that "neither the Commonwealth nor the Authority shall be obligated to pay the same or the interest thereon except from revenues of the port facility and that neither the faith and credit nor the taxing power of the Commonwealth or of any political subdivision thereof is pledged to the payment of the principal of or the interest on such bonds." Code § 62-106.19.

The Authority agreed in the Contract, § 4.03, that it will "urgently request" the General Assembly at each session during the original term of the Lease to make an appropriation for the purpose of participating in the cost of the port facilities to the extent of 50 per cent of the basic rent. Such appropriations will be promptly deposited in the Sinking Fund created under the Trust Agreement, and if the Railway is not then in default under the Lease the next installment or installments of the basic rent will be reduced by an amount equal to the State contribution.

The Comptroller, expressing doubt about the constitutionality of the recited procedures, declined to issue a warrant authorizing payment for engineering services, and the Attorney General has filed his petition under Code § 8-714 for an adjudication of the questions raised and a writ of mandamus, to which the Comptroller has filed his demurrer and answer. There are no disputed facts and the questions raised will be dealt with in the following order:

I. Does the 1960 amendment of § 62-106.8 (b) of the Code violate § 185 or § 188 of the Virginia Constitution?

Section 185 of the Constitution provides, so far as we are here concerned, that the credit of the State shall not "directly or indirectly, under any device or pretense whatsoever" be granted to or in aid of any person, association, or corporation; and the State shall not become a party to or interested in any work of internal improvements, except public roads and public parks, or engage in carrying on any such work. Section 188 of the Constitution provides that "No other or greater amount of tax or revenue shall, at any time, be levied than may be required for the necessary expenses of the government, or to pay the indebtedness of the State."

As noted above, in *Harrison* v. *Day*, we held that the Enabling Act as then written did not violate either §§ 185 or 188. Section 62-106.8 (b) as then written empowered the Authority to rent, lease, buy, own, acquire and dispose of its property to carry out its purposes.

The 1960 amendment added "and to lease to another" any or all of its property. So far as the power to lease is concerned, the amendment merely gave to the Authority in express terms a power previously given in less emphatic language. Cf. *Green* v. *City of Rock Hill*, 149 S. C. 234, 147 S. E. 346.

Since, as we explicitly held in *Harrison* v. *Day, supra*, the acquisition, development and operation of port and harbor facilities as provided by the Enabling Act is a proper governmental function, the leasing of the enterprise to another by express legislative authority as the agency to do and perform the things which the Authority was created to accomplish, does not change the character of the enterprise. If it is a governmental function and a public purpose that is to be carried out by the Authority, it does not become a private function and a private purpose by being let by the Authority to another to do the work.

The object of the legislature in permitting the Lease and the object of the Authority in making the Lease is, as stated in the Attorney General's brief, not to promote the private business of the Railway, but to obtain modern and efficient general cargo port facilities, which the General Assembly has declared to be essential to the economic and industrial development of the Commonwealth and for the proper service of its agriculture and industry. This the General Assembly has declared to be a governmental function (Code § 62-106.17), which declaration is presumed to be right and entitled to great weight, *City of Richmond* v. *Dervishian*, 190 Va. 398, 405, 57 S. E. 2d 120, 123; *Hunter* v. *Redevelopment Authority*, 195 Va. 326, 335, 78 S. E. 2d 893, 899. That the enterprise is a governmental function and for a public purpose has been affirmed by this court. If the public purpose can, in the judgment of the Authority, be better accomplished through the Lease than through the operation of the enterprise by the Authority itself, there is no good reason and no constitutional obstacle against the exercise of this power to lease.

The argument in the brief for the Comptroller on this point is to the effect that we should not have decided in the first Ports Authority case (*Harrison* v. *Day, supra*), that this enterprise is a governmental function; but that if we now adhere to that decision, then it must be conceded, he says, that the Authority has the general constitutional authority to lease its facilities for operation by another. We are fully persuaded of the correctness of that decision and that it should be adhered to.

It is not our function to decide whether it is a wise policy for the

Authority to lease this facility rather than to operate it itself. Courts have nothing to do with the wisdom of legislation. The question for us is whether the legislature has the power to authorize the Lease. We consider that question in the light of the well settled principle that every reasonable doubt should be resolved in favor of the constitutionality of an Act of the legislature. Only when it is plainly in violation of the Constitution will the court so decide, *Almond* v. *Gilmer*, 188 Va. 822, 51 S. E. 2d 272; *Almond* v. *Day*, 199 Va. 1, 97 S. E. 2d 824; *Harrison* v. *Day, supra*, 200 Va. 764, 107 S. E. 2d 594. On that basis and in view of our holding in the first Ports Authority case, we think it entirely clear that the legislature violated no constitutional provision in authorizing the Authority to lease the property.

■ The holding in the former case that State appropriations in furtherance of the acquisition, development and operation of the port facilities are for a public and not a private purpose answers in the negative the question of whether there is any violation of § 188 of the Constitution in § 62-106.14 of the Code authorizing the Authority to pledge to the payment of the revenue bonds any monies received by it under any appropriation to it by the General Assembly.

■ II. Does the tax exemption provision in § 62-106.17 of the Code violate § 168 or § 183 of the Constitution since the port facilities will be leased to and operated by the Railway, a private corporation?

Section 168 of the Constitution provides that "all property, except as hereinafter provided, shall be taxed; * *." Section 183 provides, however, that property owned directly or indirectly by the Commonwealth shall be exempt from taxation. The property will still be owned by the Authority for the benefit of the Commonwealth, subject to the Lease. The Lease does not destroy the public purpose of acquiring and operating the property, but is only the means chosen to accomplish that purpose. If the facilities were operated by the Authority, plainly they would be exempt from taxation. The plan of operating it by a lessee of the Authority pursuant to power given by the General Assembly, does not result in losing the exemption provided by § 183 from the provision of § 168 of the Constitution. *Cf. Sigman* v. *Brunswick Port Authority*, 214 Ga. 332, 104 S. E. 2d 467; *State* v. *Inter-American Center Authority*,      Fla.    , 84 So. 2d 9; *Visina* v. *Freeman*, 252 Minn. 177, 89 N. W. 2d 635.

■ III. Do the Contract, the Lease and the Bond Issue constitute a valid exercise by the Authority of its powers under the Enabling

Act? The doubt expressed by the Comptroller in this respect relates to the following questions:

(1) Do these instruments violate § 62-106.17 of the Enabling Act, which requires the Authority to exercise its granted powers "for the benefit of the inhabitants of the Commonwealth"? The question is whether leasing the facilities to a private corporation for operation serves a public purpose.

The answer is supplied primarily by the first Ports Authority case, *Harrison* v. *Day*, in which we held that the enterprise was a governmental function exercised for public purpose. Under the Lease the same functions will be performed and the same public purposes will be served as if the Authority operated the facilities; and apparently it is the judgment of both the General Assembly and the Authority that the cost to the State will be less. By the Lease the Railway agrees to operate the leased premises as port terminal facilities for use by the general public on a fair and reasonable basis, free of any unreasonable or unjust discrimination. It is immaterial that the lessee may also receive benefit. It is well settled, certainly in this State, that "The fact that property acquired to serve the public may also incidentally benefit some private individuals does not destroy the public character of the use." *City of Richmond* v. *Dervishian, supra,* 190 Va. at 407, 57 S. E. 2d at 124. In *Harrison* v. *Day,* 200 Va. 750, 107 S. E. 2d 585, the Produce Market Authority Act (Code §§ 3-79.1 ff.), which gave the Authority power to lease, was upheld on the issue of whether the Produce Market was generally for the State's benefit or strictly for the purpose of promoting private enterprise.

In *Almond* v. *Day,* 197 Va. 782, 791, 91 S. E. 2d 660, 667, we said: "When the underlying and activating purpose of the transaction and the financial obligation incurred are for the State's benefit, there is no lending of its credit though it may have expended its funds or incurred an obligation that benefits another. Merely because the State incurs an indebtedness or expends its funds for its benefit and others may incidentally profit thereby does not bring the transaction within the letter or the spirit of the 'credit clause' prohibition."

To like effect are *North Carolina State Ports Authority* v. *First-Citizens Bank & Trust Co., et al.,* 242 N. C. 416, 88 S. E. 2d 109; *Visina* v. *Freeman, supra; Marchant* v. *Mayor and City Council of Baltimore,* 146 Md. 513, 126 A. 884; *Holly* v. *City of Elizabethton,* 193 Tenn. 46, 241 S. W. 2d 1001; *Newberry* v. *City of Andalusia,* 257 Ala. 49, 57 So. 2d 629.

(2) Do said instruments create a debt of the State in violation of §§ 184, 184a, or 184b of the Constitution, or lend the credit of the State "to or in aid of any person, association, or corporation" in violation of § 185 of the Constitution?

Section 62-106.19 of the Enabling Act specifically provides that the revenue bonds issued by the Authority shall not constitute a debt of the Commonwealth or a pledge of the faith and credit of the Commonwealth or of its taxing power, but shall be payable solely from the revenues derived from the project and the bonds themselves shall contain a statement to that effect. The proposed bond issue complies in all respects with that requirement.

Nevertheless, the brief for the Comptroller contends that by the Contract and the Lease and the circumstances of their execution there is a moral obligation on the Commonwealth to make appropriations which in effect violates § 185 of the Constitution prohibiting the lending of the credit of the State in aid of any person, association or corporation, and § 184a prohibiting the contracting of such debt or liability by or on behalf of the State.

The basis of the contention is that by § 4.03 of the Contract the Authority agrees that it will "urgently request" the General Assembly, at each session subsequent to the 1960 session, at which it made the appropriation referred to above, "to make an appropriation for the purpose of participating in the cost of said port facilities to the extent of fifty per cent (50%) of the basic rent." Such appropriations will be paid over to the Trustee and deposited to the credit of the Sinking Fund created by the Trust Agreement and applied to the payment of the revenue bonds.

In letters to the Governor, dated December 7, 1959, and January 12, 1960, copies of which were sent to members of the General Assembly, the Chairman of the Authority described the proposals resulting from extended negotiations between the Authority and the Railway, which included the proposal that the State "would make available to the Authority funds to be applied annually in such manner as to reduce by fifty per cent the rental obligations of the Railway," with the understanding that the State could not be contractually obligated to make such appropriations "but the expectation of such continued appropriations would be represented to the General Assembly as an essential ingredient of the negotiations."

However, in enacting the Enabling Act the General Assembly expressly stated in § 62-106.14 thereof "that nothing herein shall be construed to obligate the General Assembly to make any such appro-

priation." The risk of persuasion belongs to the Railway, which is unconditionally committed to pay rent sufficient to pay fully the principal and interest on the revenue bonds regardless of further contribution by the State.

Section 1.06 of the Lease provides that so long as any revenue bonds remain outstanding the obligation of the Railway to pay the rent "shall not be abated, reduced, abrogated, waived, diminished or otherwise modified in any manner or to any extent whatsoever, regardless of any contingency," including "the failure of the Commonwealth of Virginia to make available any State contributions or a sufficient amount of State contributions." Contributions made by the State will be for a public purpose. *Harrison* v. *Day*, *supra*, 200 Va. at 775, 107 S. E. 2d at 601.

In *Almond* v. *Gilmer*, *supra*, the constitutionality of the State Revenue Bond Act (Acts 1940, ch. 399, p. 711) was established, which empowered the Highway Commission to acquire and operate certain bridge, ferry and highway properties by means of revenue bonds payable from revenues of the project, and not to be deemed to constitute a debt of the State or pledge of the State's credit. But the Act provided that the legislature might in its discretion make appropriations for the maintenance, repair and operation of the projects. "Yet," we said, "unless and until other funds be so voluntarily made available, the receipts are charged with the cost of maintenance, repair and operation, and the right of the holders of the bonds to be paid interest and principal is therefore subordinate thereto and the State is not even indirectly or contingently obligated to make appropriation for their payment."

"It is true that the Commission and the State of Virginia may stand by as benevolent protectors of this enterprise of their creation. The one may allocate any funds not otherwise allocated or prohibited, to aid in its acquisition, maintenance and operation, and the other may make such appropriations toward those ends as it may desire. Yet neither is required to assume such philanthropic role." 188 Va. at 840-1, 51 S. E. 2d at 279.

The brief for the Comptroller concedes that "If the principle of *Almond* v. *Gilmer*, *supra*, is applicable to these proposals, it cannot be denied that there is no infringement of Section 185." Clearly it is applicable here and is confirmed by the holdings in the later cases of *Almond* v. *Day*, *supra*, 197 Va. 782, 91 S. E. 2d 660, and *Harrison* v. *Day*, *supra*, 200 Va. 750, 107 S. E. 2d 585, as well as by similar holdings in other jurisdictions: *Sigman* v. *Brunswick Port Authority*,

*supra; Meier* v. *City of Madison,* 257 Wis. 174, 42 N. W. 2d 914; *Newberry* v. *City of Andalusia, supra; State* v. *Dade County,* Fla. , 62 So. 2d 404; *Darnell* v. *County of Montgomery,* 202 Tenn. 560, 308 S. W. 2d 373; *Visina* v. *Freeman, supra.*

We find no violation of §§ 184, 184a, 184b or 185 of the Constitution in the Contract, the Trust Agreement or the Lease here involved.

■ Section 1.03 of the Lease provides for a reduction in the basic rent to be paid by the Railway if and when the revenue bonds are retired. Section 11.01 of the Lease grants the Railway options to extend the Lease for two thirty-year periods on terms to be agreed on by the parties, and § 11.02 gives it the option to purchase the premises at the end of a term after the revenue bonds have been retired. Formulae for determining the amount of the rental during a renewal term and for determining the purchase price are not based on the fair market value or the income value of the property. The Comptroller questions whether if the rentals and purchase price so ascertained should result in less than the fair market values there would be a granting of the State's credit in aid of the Railway, or an illegal agreement on the part of the Authority.

As noted above, Code § 62-106.8 empowers the Authority to lease the facilities, with an option to buy on such terms and conditions and at such price as the Authority shall determine after all indebtedness is paid. There is nothing in the Constitution to prevent the General Assembly from granting these powers to the Authority, and if exercised in good faith and without clear abuse of discretion, which is not here questioned, it is not a matter of judicial cognizance. *Green* v. *City of Rock Hill, supra; Oakley* v. *Atlantic City,* 63 N. J. Law 127, 44 A. 651; *Admiral Realty Co.* v. *City of New York,* 206 N. Y. 110, 99 N. E. 241; *Darnell* v. *County of Montgomery, supra.*

■ Section 62-106.14 of the Enabling Act authorizes the Authority to fix and revise charges for the use of the port facilities under its control, so as to provide, with other revenues if any, for the cost of operation and retirement of debt. Section 3.03 of the Lease provides that the rates and regulations shall be fixed and enforced by the Railway, on a fair and reasonable basis free of discrimination, and after giving due consideration to certain factors, including comparable rates and regulations at other Virginia and competitive ports. These rates and regulations shall be presumed as between the parties to be in compliance with the Lease unless determined to be unfair or unlawful by a governmental body or by agreement between the parties. It is

suggested that said § 3.03 is an unlawful delegation of the Authority's responsibility. The General Assembly obviously did not think so and we think there is no substance to the point.

Finally, the Comptroller inquires whether § 8.01, which provides for participation by the Authority in the profits, if any, of the enterprise, authorizes an unlawful participation in a competitive commercial enterprise.

This section provides for nothing more than a hoped for additional rent. On the authority of *Shenandoah Lime Co.* v. *Governor*, 115 Va. 865, 80 S. E. 753, and *Harrison* v. *Day, supra*, 200 Va. 764, 107 S. E. 2d 594, we answer that the provision is not unlawful. As said in *Admiral Realty Co.* v. *City of N. Y., supra*, 206 N. Y. at 132, 99 N. E. at 247, the owner does not become a partner with the tenant because he relates the amount of his rent to the profits of the business. "The time-honored practice of leasing a farm on shares, instead of for a fixed, annual rental, has never been supposed or held to transform a lease into articles of co-partnership."

For the reasons stated we hold that the Enabling Act as amended is valid and constitutional, and that the Contract, the Lease and the proposed revenue bond issue are a valid exercise of the powers granted to the Authority by that Act.

The writ of mandamus prayed for is

*Awarded.*