411 S.E.2d 1 (1991)
Marcia P. DYKES
v.
NORTHERN VIRGINIA TRANSPORTATION DISTRICT COMMISSION, et al.
Osgood TOWER
v.
NORTHERN VIRGINIA TRANSPORTATION DISTRICT COMMISSION, et al.
Record Nos. 901033, 901037.
Supreme Court of Virginia.
April 19, 1991.
On Rehearing November 8, 1991.
Rehearing Denied January 10, 1992.
James H. Falk, Jr. (Scott A. Mills and James H. Falk, Sr., McGovern, Noel, Falk, Pannone, Procaccini & O'Leary, on briefs), for appellant Marcia P. Dykes.
*2 Fredrick H. Goldbecker for appellant Osgood Tower.
William G. Broaddus (David T. Stitt, County Atty., A. Robert Cherin, Deputy County Atty., Ellen F.M. Posner, Asst. County Atty., A. Francis Robinson, Jr., James K. Manning, William J. Strickland, and Brown & Wood; McGuire, Woods, Battle & Boothe, on brief), for appellees, Northern Virginia Transp. Dist. Com'n, et al.
Commonwealth of Virginia, L. Douglas Wilder, Governor of the Com. of Virginia, A.L. Philpott, Speaker of the Virginia House of Delegates, Hunter B. Andrews, Chairman of the Virginia Senate Finance Committee, Robert B. Ball, Sr., Chairman of the Virginia House of Delegates Appropriations Committee, C. Richard Cranwell, Chairman of the Virginia House of Delegates Finance Committee, Local Government Attys. of Virginia, Inc., Virginia Ass'n of Counties, Virginia Mun. League, Virginia Government Finance Officers Ass'n, Government Finance Officers Ass'n of the Metropolitan Washington Area, County of Arlington, Va., County of Loudoun, Va., County of Prince William, Va., County of Roanoke, Va., County of Scott, Va., County of York, Va., H. Lane Kneedler, Chief Deputy Atty. Gen. (Mary Sue Terry, Atty. Gen., K. Marshall Cook, Deputy Atty. Gen., Barbara M. Rose, Sr. Asst. Atty. Gen., Barbara H. Vann, Stephen Chapple, Asst. Attys. Gen., on brief); Rockingham County, Va. (George R. Aldhizer, Jr., Carolyn M. Perry, G. Chris Brown, Wharton, Aldhizer & Weaver, on brief); Chesterfield County, Va., City of Roanoke, Va. (Steven L. Micas, County Atty., Wilburn C. Dibling, Jr., City Atty., on brief); and Anderson & Strudwick, Inc., Branch Cabell & Co., Cent. Fidelity Bank, Craigie Inc., Crestar Financial Corp., Davenport & Co. of Virginia, Inc., Dominion Bank, Nat. Ass'n, Scott & Stringfellow Inv. Corp., Signet Credit Corp., Sovran Inv. Corp., Wheat, First Securities, Inc., and Virginia Chamber of Commerce (Harry Frazier, III, Jack Spain, Jr., Bryar C. Nettles, and Hunton & Williams, on brief), amici curiae, for appellees.
Gloria T. Fisher, Northern Virginia Soil and Water Conservation Bd., Director, Gary T. Amos, Associate Professor, College of Law and Government, Regent University, Mark Siljander, Lawrence D. Pratt, Gwendalyn F. Cody, John F. Herrity, Robert T. Robarge, Craig C. Markva, D. Patrick Mullins, Brig. Gen. Benton Partin (Ret.), James G. Lamb, Christy Ann Collins, Martin P. Claussen, PhD, Evelyn B. Claussen, Kennelm Winslow, II, Committee to Protect the Family Foundation, Springfield Committee of Correspondence, Anthony J. Slaga, Dorothy T. Slaga, Charles L. Selander, Ann Frances Dodd, Ann Mianegez, Susan E. Holland, John T. Towell, Director, Family Foundation, Walter E. Barbee, Chairman, Virginians for Family Values, Rodney E. Montgomery, President, Fairfax Citizens Council, Elizabeth A. Robinson, Patricia S. Robinson, Ann Margaret Robinson, Charles Clark Robinson, Calvin Ridley Dodd, Zoa F. Dodd, Robert A. Dodd, Richard P. Dodd, Ellen S. Shepherd, P. George Tryfiates, Laurie K. Tryfiates, Rev. Stanley P. Gorman, Tracey L. Gorman, John M. Vann, Eleanor B. Vann, Roger L. Gounaud, Karen J. Gounaud, Kurt M. Markva, Michael W. Thompson, Donald E. Roe, Gene L. Malpas, Nancy Tower (Neil F. Markva, on brief); Citizens Against Pledge Bonds, Inc. (Patrick M. McSweeney, Stephen T. Gannon, McSweeney, Burtch & Crump, on brief); and Nancy Tower and Ernest R. Blevins (Fredrick H. Goldbecker, on brief), amici cariae, for appellants.
Present: CARRICO, C.J., STEPHENSON, RUSSELL, WHITING and LACY, JJ., POFF, Senior Justice, and HARRISON, Retired Justice.
WHITING, Justice.
This is a proceeding to validate a proposed bond issue to be repaid solely by funds appropriated by a county's board of supervisors, and which is not to be submitted to a vote of the people. The issue is whether the county will incur a long-term debt proscribed by Article VII, § 10(b) of the Constitution of Virginia (Article VII, § 10(b)).
In order to finance a part of the cost of completing the Fairfax County Parkway, the Fairfax County Board of Supervisors *3 (the county) approved a proposed contract (the contract) with the Northern Virginia Transportation District Commission (the commission). The contract would obligate the commission to issue its "Transportation Contract Revenue Bonds" (the bonds) in an aggregate amount not to exceed $330,000,000. In return, the county would agree to fund the annual principal and interest payments and other listed expenses of the bond issue, to be disbursed by a trustee.[1] These funds would come from the county's "general revenues" and from "the Business, Professional and Occupational License Tax ... or any other revenue appropriated... in substitution for or in addition thereto by" the county.
However, Section 4.05 of the contract would provide that
[t]he obligation of the County to make any payments ... is contingent upon the appropriation for each fiscal year by the Board of Supervisors of the County of funds from which such payments can be made. The County shall not be liable for any amounts that may be payable pursuant to this Contract unless and until such funds have been so appropriated for payment and then only to the extent thereof. It is understood and agreed by the parties hereto that nothing in this Contract shall be deemed to obligate the Board of Supervisors of the County to appropriate any sums on account of any payments to be made by the County hereunder. This Contract shall not constitute a pledge of the full faith and credit of Fairfax County or a bond or debt of Fairfax County in violation of Section 10 of Article VII of the Constitution of the Commonwealth.
As security for the payment of the bonds, the commission would transfer its interest in the contract by a proposed trust agreement (the trust agreement). The trust agreement, and the bonds themselves, would provide that "[t]he Bonds are limited obligations of the Commission payable solely from" the moneys provided to the Trustee by the County. The trust agreement further would provide that "[t]he obligation of the County ... to make such payments ... is subject to and contingent upon the annual appropriation by the County of moneys for such purpose."
On May 4, 1990, pursuant to the provisions of Code § 15.1-214, the commission and the county, as a "Plaintiff/Intervenor" (the plaintiffs), filed this bond validation proceeding against the "[t]axpayers, property owners and citizens" of Fairfax County and other localities serviced by the commission. Osgood Tower, Marcia P. Dykes, and "John Doe and Jane Doe numbers 1-25," Fairfax County citizens and taxpayers (the taxpayers), opposed the bond validation.
On July 12, after extended hearings and argument, the trial court validated the proposed bond issue. The taxpayers appeal.
The taxpayers argue that because the indebtedness represented by the bond issue would extend for a period beyond the fiscal year of its proposed year of issue, it would be a long-term debt contracted by the county without voter approval. Therefore, the taxpayers contend that the bond issue would violate the following provision of Article VII, § 10(b):
No [long-term] debt shall be contracted by or on behalf of any county ... except by authority conferred by the General Assembly by general law. The General Assembly shall not authorize any such debt [except listed debts not relevant here] unless in the general law authorizing the same, provision be made for submission to the qualified voters of the county or district thereof or the region or district thereof, as the case may be, for approval or rejection by a majority vote of the qualified voters voting in an election on the question of contracting such debt. Such approval shall be a prerequisite to contracting such debt.
The plaintiffs respond that the financing plan would not violate Article VII, § 10(b) because they say that contracts subject to appropriation and bonds payable solely from payments pursuant to such contracts are not "debts" as prohibited by the Virginia *4 Constitution. Here, the plaintiffs seek to extend the scope of what is known as the "special fund" exception to constitutional limitations upon incurring long-term governmental debts without voter approval.
In a case dealing with a long-term state debt and analogous constitutional limitation upon the state's power to incur such debts, we summarized the special fund exception by quoting from Miller v. Watts, 215 Va. 836, 841, 214 S.E.2d 165, 169 (1975):
[N]o constitutionally prohibited indebtedness is created when bonds issued to finance a particular State capital project are to be paid solely from a special fund derived from the revenues of that project; when the legislature is not obligated to appropriate funds for payment of the indebtedness; and, when the indebtedness is not secured by the general faith, credit, and taxing power of the State.
Baliles v. Mazur, 224 Va. 462, 469-70, 297 S.E.2d 695, 699 (1982) (emphasis added).
The plaintiffs rely upon three cases in which an analogous constitutional limitation was considered in connection with long-term indebtednesses proposed for the state's benefit. In those cases, we held that those indebtednesses would not be within the constitutional limitations because they were to be paid solely from special funds derived from the revenues of the financed projects. Baliles, 224 Va. at 466, 297 S.E.2d at 697 (rent for government's use of office and other buildings); Harrison v. Day, 202 Va. 967, 970, 121 S.E.2d 615, 617 (1961) (rent for use of port facilities); Almond v. Gilmer, 188 Va. 822, 840, 51 S.E.2d 272, 279 (1949) (toll fees and other charges earned by bridges and ferries). Here, there is no special fund because no income will be derived from the use of the Parkway; the only source of revenue for bond payments will be the county's annual appropriations from its occupational license receipts and other state revenues.
The plaintiffs contend that this would make no difference because we said in Baliles that "[t]he overriding consideration, therefore, is whether the legislative body is obligated to appropriate the funds, not the source or composition of the special fund." 224 Va. at 471, 297 S.E.2d at 700. That statement, however, was made in response to a contention that the "special fund" doctrine could not be applicable in Baliles because the rent to be paid by the Commonwealth for its use of the buildings was a "fund consist[ing] entirely of money appropriated by the legislature." Id. As noted above, however, Baliles concerned a revenue-generating project and is therefore inapposite. Thus, this is the first case in which we have considered the implications of Article VII, § 10(b) in circumstances where the facility financed will not be a revenue-generating project.
In Terry v. Mazur, 234 Va. 442, 362 S.E.2d 904 (1987), we considered a statutory scheme purporting to authorize the Commonwealth Transportation Board to issue revenue bonds to finance highway improvements. The bonds were to be secured by a "pledge" of future excise and other taxes, as well as fees relating to motor vehicles. The Attorney General contended that the bond issue met the requirements of the "special fund" doctrine, and was therefore constitutionally permissible without submission to a vote of the people. We disagreed, refusing to extend the "special fund" doctrine to projects other than those which generate their own revenues. Id. at 455, 362 S.E.2d at 911. We adhere to that view.
The plaintiffs also contend that the bonds would not be a "debt" of the county because the bonds would be issued by the commission, not by the county. That, in our view, is a mere subterfuge. Because the trust agreement and the bonds themselves look to annual appropriations of the county's funds as the sole source for repayment of the bonds, it is of no consequence that bonds would be issued by the county's alter ego. "We must look to the purpose of the instruments, their substance and not their form. Merely giving to them a particular name or form [does] not take away the nature and effect of the transaction." Bolling v. Hawthorne Coal Co., 197 Va. 554, 566, 90 S.E.2d 159, 168 (1955).
Although the contract permits the county to discontinue its promised appropriations, *5 we must also consider the practical effect of such a calamitous event in deciding whether the county in fact would be bound to continue to service the bond issue and, therefore, has incurred a "debt" proscribed by Article VII, § 10(b). The county recognizes the importance of its fiscal integrity. It has been advised that the bond issue would not affect its triple A bond rating. In fact, the contract would prohibit the county from changing its designation of the proceeds of its annual business, professional, and occupational tax as the primary source of appropriations for its annual bond payments without obtaining "confirmation from those rating agencies that shall have ... rated and maintained ratings on the Bonds, that the then current ratings on the Bonds will not be reduced as a result of such change."
The county also recognizes the disastrous effect that would follow any failure by the board of supervisors to make an annual appropriation and the county argues that such a disaster would never be permitted to occur. That argument implicitly acknowledges that the bond issue would have the practical effect of a longterm debt binding the county.
The predecessor to Article VII, § 10(b) was adopted "[t]o safeguard the credit and fiscal integrity of the counties." II A. Howard, Commentaries on the Constitution of Virginia 863 (1974) (emphasis added). In explicating the predecessor to Article VII, § 10(b), we said that
approval by a majority of the citizens voting on the question properly submitted to them, is a prerequisite to the power of the board of supervisors to create an obligation for any purpose, payable at some future time beyond the termination of the current fiscal year. In no other way, directly or indirectly, can the board bind the county on any such obligation.
American-LaFrance and Foamite Industries, Inc. v. Arlington County, 164 Va. 1, 9, 178 S.E. 783, 786 (1935) (emphasis added).
The plaintiffs here impermissibly seek to accomplish indirectly what they cannot do directly. See, e.g., Hart v. Commonwealth, 221 Va. 283, 290, 269 S.E.2d 806, 811 (1980); Foti v. Cook, 220 Va. 800, 807, 263 S.E.2d 430, 434 (1980). It is obviously contemplated that the issuance of the bonds in accordance with the contract would bind future boards of supervisors to make annual appropriations of sufficient funds to finance the bonds. Manifestly, the animating purpose of the bond contract arrangement is to create a long-term debt, without submitting the debt to a vote of the qualified voters of Fairfax County.
We hold, therefore, that the obligation thus incurred would be a "debt contracted by the county" in violation of Article VII, § 10(b) and, hence, that the bond issue would be invalid. Accordingly, we will reverse the judgment of the trial court and enter final judgment invalidating the bond issue.
Reversed and final judgment.
LACY, J., concurs and files an opinion.
CARRICO, C.J., dissents and files an opinion.
LACY, Justice, concurring.
This Court has come too far in its consideration of the constitutionality of financial obligations undertaken by state and local governments to declare today that an obligation is a debt for purposes of Article VII, § 10(b) of the Virginia Constitution when the obligation is only a conditional promise to pay, it is admitted by the parties to be only a moral obligation, and cannot be enforced through any legal process. This holding allows the "disastrous effect" of the failure to perform to create a legal obligation and directly contradicts the holdings and statements made by this Court in numerous prior cases, without any attempt to address, distinguish, or overrule them. E.g., Terry v. Mazur, 234 Va. 442, 451, 362 S.E.2d 904, 909 (1987); Baliles v. Mazur, 224 Va. 462, 469, 297 S.E.2d 695, 698-99 (1982); Harrison v. Day, 202 Va. 967, 975-77, 121 S.E.2d 615, 620-22 (1961); Almond v. Gilmer, 188 Va. 822, 840-41, 51 S.E.2d 272, 279 (1949). This is the first instance in which the repayment of bonds is totally dependent on a conditional promise of the *6 governmental unit. Although the "practical effect of such a calamitous event" on the governmental unit should it choose not to keep its promise to appropriate funds was no less present in these prior cases, it did not transform a conditional appropriation into a debt under Article VII, § 10(b). Baliles, v. Mazur, supra.
I agree with the majority's analysis of the special fund doctrine as it applies to this case. I cannot accept the rationale by which the majority reverses the trial court's judgment. The county's promise to pay, which does not have to be kept, although the basis for the security underlying the bonds, nonetheless, does not legally obligate the county to appropriate sums for payment of a debt beyond one year and, therefore, does not run afoul of the constitutional prohibition.[*] Nevertheless, I concur in the result the majority reaches because the contract between the county and the commission violates the Transportation District Act of 1964, Va.Code §§ 15.1-1342, et seq.
The Act was passed to allow the provision of transportation services and facilities on a regional basis. As reflected in the Act, effective planning and provision of a transportation infrastructure "cannot be achieved by the unilateral action of the counties." Code § 15.1-1343. The Act is not structured simply to provide a county with a financing mechanism for its own facilities, facilities in which the district commission has no interest whatsoever. In this regard, the district commission is similar to the Ports Authority and Public Building Authority. These entities were created to undertake certain types of projects which would provide directly, or through sale or lease, certain services and facilities.
Consistent with this purpose § 15.1-1359 allows the county to enter into contracts with the commission "pursuant to which... [the commission] ... undertakes to provide the transportation facilities specified in a duly adopted transportation plan, and/or to render transportation service." Here, the commission is neither providing transportation facilities nor rendering transportation services to the county. It is only providing money to the county which in turn will construct the facilities, own them, and use them to provide transportation services. Code § 15.1-1359 does not authorize the county to enter into a contract with the commission where neither transportation service nor facilities are to be provided by the commission. Therefore, in my opinion, the contract at issue is invalid because it violates the Act.
I believe the contract also violates § 15.1-1364(b), which provides that the obligations and indebtedness of a commission "shall not create ... any ... obligation ... of any ... county ... either legal, moral or otherwise...." The majority, the appellants, the Attorney General, and even the appellees acknowledge that the contract imposes some type of obligation on the county. In fact, the Attorney General and the appellees have labeled the obligation a "moral" one. Furthermore, the contract obligates the county to hold the commission harmless from any liability or expense "arising out of or in connection with this Contract or the Bonds or the Trust Agreement."
Section 15.1-1364 is not a mere repetition by the General Assembly assuring that a commission obligation would not be "deemed to be" or interpreted as the legal obligation of a county or city subject to the constitutional limitation. See, e.g., § 15.1-1358.2(a)(2). Rather, this section prohibits creating such an obligation in fact, precisely to preclude the type of circumvention of statutory and constitutional provisions attempted here. The obligation of the commission to repay the $330,000,000 bonded indebtedness as reflected in the bond, trust, and contract documents creates an obligation, "moral or otherwise," on behalf of the county and, therefore, does not comply with the provisions of the Act.
*7 Finally, the concluding proviso of § 15.1-1364(b) states that "nothing in this chapter... shall be construed to authorize a commission... to incur any indebtedness on behalf of or ... obligate the ... county...." Thus, the General Assembly has stressed again that the commission's actions under the statute must comply with the law of the Commonwealth. The commission's obligations as reflected in the contract do not comport with this statutory provision. Therefore, both the county and the commission are precluded from executing the instant contract under the terms of the Act.
If the trial court's decree validating the bonds in issue is sustained, it is conclusive as to the validity of the "means provided for the payment of such bonds and the validity of all pledges of revenues and of all covenants...." Code § 15.1-220. For the reasons set out above, I believe the contract offered as security for the bonds is invalid and, therefore, the judgment of the trial court must be reversed.
CARRICO, Chief Justice, dissenting.
I disagree with the majority. I have great difficulty, however, in stating the basis of my disagreement because I have even greater difficulty in discerning upon what basis the majority invalidates the bonds in question.
The majority concedes that "the contract permits the county to discontinue its promised appropriations." That should be the end of the case. Yet, continuing its search for a basis to invalidate the bonds, the majority says that the Court "must ... consider the practical effect of [the county's discontinuance of its promised appropriations] in deciding whether the county in fact would be bound to continue to service the bond issue and, therefore, has incurred a `debt' proscribed by Article VII, § 10(b)." (Emphasis added.)
The majority notes the county's recognition of "the importance of its fiscal integrity" as well as "the disastrous effect that would follow any failure by the board of supervisors to make an annual appropriation." Then, opining that the county "impermissibly seek[s] to accomplish indirectly what [it] cannot do directly," the majority says it is obvious that "the issuance of the bonds in accordance with the contract would bind future boards of supervisors to make annual appropriations of sufficient funds to finance the bonds."
It might be obvious to the majority that the county would be bound to make annual appropriations of sufficient funds to finance the bonds, but it is not obvious to me. This is what the majority is saying: The practical effect of the county's exercise of its contractual right to discontinue the promised appropriations is to make it legally obligated to continue the promised appropriations.
I thought I knew what the term "practical effect" meant. I also thought I knew what the term "legally obligated" meant. And, to me, the two terms meant quite different things. Much to my surprise and dismay, however, the majority says the two terms mean the same thing, and I daresay the business and financial communities in this state will be equally surprised and dismayed at the majority's revelation.
It appears, therefore, that "practical effect" is the basis of the majority's invalidation of the bonds in question. If that is the basis, I consider it far too slender a reed to support such drastic action.
Rather, in my opinion, the bonds should be invalidated only if the county has undertaken an unconditional express obligation to continue making appropriations to pay the full amount of the bonds. I do not believe the county has undertaken such an obligation, and I would say this whether or not a special fund exists in this case.
The majority fails to even cite, let alone give effect to, important statutory provisions applicable to the transaction involved in this case. Code § 15.1-1358.2(a)(2) provides that "[t]he bonds and other obligations of a [transportation] district (and such bonds and obligations shall so state on their face) shall not be a debt of the Commonwealth or any political subdivision thereof and neither the Commonwealth nor any political subdivision thereof other than the district shall be liable thereon." Furthermore, pursuant to Code § 15.1-1364(b), *8 except for claims cognizable under the Virginia Tort Claims Act, "the obligations and any indebtedness of a [transportation district] commission shall not be ... a debt or liability of the Commonwealth, or of any county or city ... either legal, moral or otherwise."
Furthermore, the contract between the county and the commission provides that "nothing [therein] shall be deemed to obligate the Board of Supervisors of the County to appropriate any sums on account of any payments to be made by the County [thereunder]" and that the contract "shall not constitute a pledge of the full faith and credit of Fairfax County." And each bond proposed to be issued by the commission will bear the disclaimer of the county's liability, as required by Code § 15.1-1358.2(a)(2).
I, too, think the Court should look to the "substance and not [the] form" of the pertinent documents in this case. See Bolling v. Hawthorne Coal Co., 197 Va. 554, 566, 90 S.E.2d 159, 168 (1955). But I think the Court must also look to the substance of applicable statutory provisions in determining the real effect, rather than the mere practical effect, of the documents in question. And, when I look at the case in this way, I do not see the evil the majority seems to find lurking behind every word the parties have used to express their undertaking.
Nor do I understand how, in the face of all the indicia of non-indebtedness present in the statute, the contract, and the bonds involved in this case, the majority can conclude that the county has incurred binding indebtedness in violation of Article VII, § 10(b). In reaching this conclusion, the majority has taken a mighty leap in logic to get where it wants to go. This is too great a leap for me, and I dissent.
Present: CARRICO, C.J., COMPTON, STEPHENSON, WHITING, LACY, and KEENAN, JJ., and POFF, Senior Justice.
UPON REHEARING
LACY, Justice.
On May 3, 1990, the Northern Virginia Transportation District Commission (the Commission) adopted a resolution providing for the issuance of Northern Virginia Transportation District Commission Fairfax County Transportation Contract Revenue Bonds (bonds) in an amount not to exceed $330,000,000. The proceeds from the sale of the bonds are to be used by Fairfax County to complete the construction of the Fairfax County Parkway. On May 4, 1990, the Commission and Fairfax County, as a plaintiff intervenor, filed this bond validation proceeding pursuant to Code § 15.1-214 in the Circuit Court of Fairfax County. Osgood Tower, Marcia P. Dykes, along with other unnamed taxpayers and citizens of Fairfax County, opposed validation of the bonds.
On July 12, after extended hearings and argument, the trial court validated the proposed bond issue. Tower and Dykes appealed. We consolidated the appeals and on April 19, 1991, this Court determined that the trial court erred in validating the bonds. The County and the Commission filed motions for rehearing, which were granted on June 4, 1991.
Dykes and Tower argue that Art. VII, § 10(b) of the Virginia Constitution is applicable to the debt which will be incurred by issuing the bonds and, therefore, to be valid, the debt must either be approved by a vote of the people or qualify within the judicially-created "special fund" doctrine. They maintain that neither of these criteria is met in this instance and, therefore, the bonds are invalid.
The threshold issue for consideration is whether Art. VII, § 10(b) is applicable to the debt in issue. That section states in pertinent part:
No debt shall be contracted by or on behalf of any county or district thereof... except by authority conferred by the General Assembly by general law. The General Assembly shall not authorize any such debt ... unless ... provision be made for submission to the qualified voters of the county or district thereof ... for approval or rejection by a majority vote of the qualified voters voting in an election on the question of contracting *9 such debt. Such approval shall be a prerequisite to contracting such debt.
1. Commission Debt
Dykes argues that this section is applicable to bonds issued by the Commission because the Commission is a "district `created' by one or more cities and counties... proposing to issue bonds `by or on behalf of the County." This argument is unpersuasive. The use of the word "district" in the name of the Commission is insufficient to extend application of the section to it. Furthermore, the Constitution speaks in terms of a "district thereof." The Commission was authorized and created by statute, and is comprised of the Cities of Alexandria, Fairfax, and Falls Church, and the Counties of Arlington and Loudoun, in addition to Fairfax. Code §§ 15.1-342, et seq.; Acts 1964 c. 630." It remain[ed] in a dormant state until brought into action by the local governing body." Mumpower v. Housing Authority, 176 Va. 426, 446, 11 S.E.2d 732, 739 (1940). The Commission clearly was not "created" by Fairfax County, and is not a "district thereof."
The Commission is an independent political subdivision in the same manner as are housing authorities, water and sewer authorities, and industrial development authorities. The enabling legislation, like that of these other authorities vested with the power to incur bonded indebtedness, affirms that debt so incurred is that of the entity, not of the Commonwealth or of any other political subdivision. Code § 15.11358.2(a)(2). This statement is repeated in the bonds themselves, as well as in other documents constituting the financing proposal. We have repeatedly held that the debt incurred by legislatively created, independent political subdivisions, whatever their title, is not the debt of the Commonwealth or of any other governmental unit, and we affirm that holding here. Button v. Day, 204 Va. 270, 272-74, 130 S.E.2d 459, 461-62 (1963); Farquhar v. Board of Supervisors, 196 Va. 54, 61, 82 S.E.2d 577, 582 (1954); Mumpower, 176 Va. at 451, 11 S.E.2d at 742. Therefore, the debt which will be incurred by the Commission in issuing the bonds is not subject to the provisions of Art. VII, § 10(b) of the Virginia Constitution.
2. County Debt
Dykes and Tower next argue that the financing proposal underlying the issuance of the bonds creates a debt incurred by the County which is subject to the constitutional limitation of Art. VII, § 10(b). The financing proposal consists of a contract between the County and the Commission which has been approved but not yet executed, and a proposed trust agreement providing for the transfer of the Commission's interest in the payments received from the County.
The contract provides that the Commission will issue the bonds and that the County in turn will fund the annual principal and interest payments and other listed expenses of the bond issue. The repayment funds will come from the County's general revenues, including the Business, Professional, and Occupational License Tax "or any other revenue appropriated" by the County. Under the terms of the contract, however, the County's obligation to make the payments to the Commission "is subject to and contingent upon the annual appropriation by the County of moneys for such purpose."
Neither Tower nor Dykes seriously argues that the terms of the financing documents impose a legally enforceable obligation on the County to appropriate the funds or to repay the bonds. Indeed, the contract, the trust agreement, and the bonds, § 4.05, § 7.01, and ¶ 3, respectively, each specifically states that the County is not obligated to appropriate funds or levy taxes for the payment of the bonds and that the financing proposals do not constitute a pledge of the full faith and credit of the County.
Rather, Dykes and Tower invite us to define "debt" as used in Art. VII, § 10(b) as something other than a legally enforceable obligation to pay. Dykes says constitutional debt exists because the financing proposal creates obligations which the "County cannot avoid." Tower argues that "subject to appropriation" financing constitutes *10 a pledge of the County's full faith and credit, thereby establishing constitutional debt. Both rely on factors such as the understandings and expectations of bondholders, county officials, and bond rating agencies as creating obligations on the County. While these indicia may be significant in other contexts, such as whether the financing scheme is good or wise policy, or in determination of the investment grade or credit worthiness of the bonds, here we are only concerned with the limited question whether these indicia, or any other, establish a "debt" of the County subject to Art. VII, § 10(b).
We have described the attributes of "debt" for constitutional purposes in various ways. "[I]f the political entity is made generally liable, then an indebtedness is created within the debt limitations of the Constitution." Terry v. Mazur, 234 Va. 442, 450, 362 S.E.2d 904, 909 (1987) (quoting Farquhar, 196 Va. at 61, 82 S.E.2d at 582). Obligations which "are not secured by the general credit of the State or the issuing agency" do not constitute a debt within the constitutional limitation. Button, 204 Va. at 272, 130 S.E.2d at 461. And we have held that, for purposes of Art. X, § 9,
we have one criterion for determining the existence of unconstitutional debt: Is the full faith and credit of the Commonwealth pledged or committed? If not, no unconstitutional debt is created.
Baliles v. Mazur, 224 Va. 462, 471, 297 S.E.2d 695, 699 (1982).
We have specifically rejected the proposition that "subject to appropriation" financing in which the legislative body is not legally obligated to make the appropriation creates state debt for constitutional purposes, Almond v. Gilmer, 188 Va. 822, 842-43, 51 S.E.2d 272, 280 (1949), and have reaffirmed that holding:
[T]here was no constitutionally prohibited debt even though the "expectation" of these continued appropriations was an essential ingredient in the negotiations.... This did not in any way contractually obligate the state to make these appropriations.
Baliles, 224 Va. at 469, 297 S.E.2d at 698-99 (referencing Harrison v. Day, 202 Va. 967, 121 S.E.2d 615 (1961)).
These cases, whether involving debt incurred by the state or by a county, share a single rationale. No debt is created for constitutional purposes if the state or county "incurred no legal liability to underwrite the project." Miller, Att. Gen. v. Watts, Treas., 215 Va. 836, 845, 214 S.E.2d 165, 171 (1975). The debt created must involve a "binding and direct commitment," id. at 845, 214 S.E.2d at 172, a commitment which can be enforced against the maker. There must be a legal obligation.
"Subject to appropriation" financing does not create constitutionally cognizable debt because it does not impose any enforceable duty or liability on the County. Expectations of bondholders, County officials, or bond rating agencies do not create County "debt" any more than the expectations of the railway for continued appropriations by the state created state debt in Harrison v. Day, supra.
Under the financing proposal at issue, neither the County nor its general revenues is liable for repayment of the debt incurred by the bond issue. In the absence of a legal obligation, the County has not incurred a debt cognizable under Art. VII, § 10(b).
In summary, we hold that Art. VII, § 10(b) is not applicable here because no constitutional debt was incurred by the County, and the debt of the Commission is not subject to that constitutional provision. In light of this holding, it is unnecessary to consider application of the special fund doctrine. We have also considered Dykes's other arguments and find them without merit.[*] Accordingly, we will affirm the judgment of the trial court.
Record No. 901033Affirmed.
Record No. 901037Affirmed.
*11 WHITING, J., with whom STEPHENSON, J., and POFF, Senior Justice join, dissents and files an opinion.
STEPHENSON, J., with whom WHITING, J., and POFF, Senior Justice join, dissents and files an opinion.
WHITING, Justice, with whom STEPHENSON, Justice, and POFF, Senior Justice join, dissenting.
A rehearing of this case has produced no arguments which were not made and considered when a majority of this Court decided that the proposed bond issue was invalid.[*] No matter how the new majority phrases it, the present decision is simply an approval of an end run around the constitutional requirement of voter approval before a county can be saddled with long-term indebtedness. Accordingly, for the reasons expressed in the former majority opinion and in the dissent now filed by Justice Stephenson, I dissent.
STEPHENSON, Justice, with whom WHITING, Justice, and POFF, Senior Justice join, dissenting.
I join Justice Whiting's dissent. I write separately, however, to express additional reasons to support my position.
Never before has this Court validated a bond issue like the one in question. I find the scheme employed by the County to be a shocking, patent attempt to circumvent and nullify the requirement of voter approval contained in § 10(b).
By the proposed contract with the Commission, the County would agree to make annual payments sufficient to pay the debt service on the bonds. The funds for these payments are derived solely from, and are contingent upon, annual appropriations from the County's general revenues.
The County contends, and the majority holds, that "no constitutional debt was incurred by the County" because the payments are contingent upon the annual appropriations. Although the County states that the bondholders can expect it to make continuous, annual appropriations, it relies upon its right and power not to do so, i.e., to default without fault, as making the scheme constitutional. We should not validate such a scheme.
More importantly, no government should employ such a scheme. Indeed, "government is, or ought to be, instituted for the common benefit, protection, and security of the people," Va. Const. art. I, § 3, and the preservation of a free government requires "a firm adherence to justice, moderation, temperance, frugality, and virtue," Va. Const. art. I, § 15. These quotations are not merely abstract terms; they are found in the Bill of Rights and have been part of our basic law since the Commonwealth was established.
Is anyone so naive that they truly believe that the County, in reality, is not compelled to make annual appropriations until the bonds are retired? What are some of the consequences if the County ceases to make the appropriations? Obviously, the bondholders would have no recourse, and their bonds would be worthless. Quite obviously, also, the County's credit would be seriously impaired, if not destroyed.
The § 10(b) requirement of voter approval of long-term county debt has existed for more than six decades. The requirement was not deleted when our Constitution was revised in 1971.
More recently, the General Assembly proposed an amendment to § 10 that would have allowed counties to issue bonds, without voter approval, "for transportation purposes, the principal and interest on which [would have been] payable exclusively from the pledge of the revenues and receipts of any local taxes...." Acts 1989, c. 670; Acts 1990, cc. 736, 881. On November 6, 1990, however, this proposal was rejected overwhelmingly by the Commonwealth's voters.
*12 Today, the majority, in effect, has sanctioned what the voters rejected. Consequently, by employing the approved scheme, counties now are at liberty to create bond indebtedness, payable from their general revenues, without submitting the matter to their voters. For all practical purposes, the § 10(b) debt proscription has been nullified by judicial fiat.
NOTES
[1] Subject to a reserved right not to make the appropriations, the county also would pay the commission's listed expenses.
[*] Apparently, financial analysts and bond counsel consider the detriments of non-performance by the county to be so great that this promise, although not legally binding, provides sufficient security to potential bondholders to endorse the sale and purchase of the bonds.
[*] Tower's other assignments of error are not separately addressed. His arguments relating to maladministration by the County in violation of the Virginia Constitution parallel those of Dykes and those arguments, like Dykes's, are found to be without merit. Tower waived his remaining assignments of error at oral argument on rehearing.
[*] Amicus curiae have filed briefs on rehearing asking, inter alia, that the original decision be made prospective only. I would have had no objection to such an application of the original opinion. See, e.g., Harper v. Virginia Department of Taxation, 242 Va. 322, 410 S.E.2d 629 (1991); Harper v. Virginia Department of Taxation, 241 Va. 232, 240, 241-42, 401 S.E.2d 868, 873-74 (1991); Perkins v. Albemarle County, 214 Va. 416, 418, 200 S.E.2d 566, 568 (1973).